GALLEGOS *v.* COLORADO.

No. 475.   Argued April 9, 1962.—Decided June 4, 1962.

*Charles S. Vigil* argued the cause and filed briefs for petitioner.

*J. F. Brauer, Jr.,* Assistant Attorney General of Colorado, argued the cause for respondent.   With him on the brief were *Duke W. Dunbar,* Attorney General, and *Frank E. Hickey,* Deputy Attorney General.

Mr. Justice Douglas delivered the opinion of the Court.

Petitioner, a child of 14, and another juvenile followed an elderly man to a hotel, got into his room on a ruse, assaulted him, overpowered him, stole $13 from his pockets, and fled.   All this happened on December 20,

50

1958. Petitioner was picked up by the police on January 1, 1959, and immediately admitted the assault and robbery. At that time, however, the victim of the robbery was still alive, though hospitalized. He died on January 26, 1959, and forthwith an information charging first degree murder was returned against petitioner. A jury found him guilty, the crucial evidence introduced at the trial being a formal confession which he signed on January 7, 1959, after he had been held for five days during which time he saw no lawyer, parent, or other friendly adult. The Supreme Court of Colorado affirmed the judgment of conviction. 145 Colo. 53, 358 P. 2d 1028. We granted the petition for certiorari, 368 U. S. 815.

After petitioner's arrest on January 1, the following events took place. His mother tried to see him on Friday, January 2, but permission was denied, the reason given being that visiting hours were from 7 p. m. to 8 p. m. on Monday and Thursday. From January 1 through January 7, petitioner was in Juvenile Hall, where he was kept in security, though he was allowed to eat with the other inmates. He was examined by the police in Juvenile Hall January 2, and made a confession which an officer recorded in longhand. On January 3, 1959, a complaint was filed against him in the Juvenile Court by the investigating detectives.

The State in its brief calls this preliminary procedure in Juvenile Hall being "booked in." As noted, petitioner signed a full and formal confession on January 7. The trial in the Juvenile Court took place January 16 on a petition dated January 13 containing a charge of "assault to injure." He was committed to the State Industrial School for an indeterminate period. Thereafter, as noted above, the victim of the robbery died and the murder trial was held.

Confessions obtained by "secret inquisitorial processes" (*Chambers* v. *Florida,* 309 U. S. 227, 237) are suspect,

since such procedures are conducive to the use of physical and psychological pressures. *Chambers* v. *Florida, supra;* *Leyra* v. *Denno,* 347 U. S. 556. The reason that due process, as used in the Fourteenth Amendment, condemns the obtaining of confessions in that manner is a compound of two influences. First is the procedural requirement stated in *Chambers* v. *Florida, supra,* 236–237:

> "From the popular hatred and abhorrence of illegal confinement, torture and extortion of confessions of violations of the 'law of the land' evolved the fundamental idea that no man's life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve 'the blessings of liberty,' wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed."

We emphasized this point in *Ashcraft* v. *Tennessee,* 322 U. S. 143, 152, where we said that "always evidence concerning the inner details of secret inquisitions is weighted against an accused . . . ."

Second is the element of compulsion which is condemned by the Fifth Amendment. Chief Justice Hughes in *Brown* v. *Mississippi,* 297 U. S. 278, 285, emphasized that ingredient of due process. After noting that the Court had held that the exemption from compulsory self-incrimination in the courts of the States is not guaranteed by the Due Process Clause of the Fourteenth Amendment, he went on to say:

> "But the question of the right of the State to withdraw the privilege against self-incrimination is not

here involved. The compulsion to which the quoted statements refer is that of the processes of justice by which the accused may be called as a witness and required to testify. Compulsion by torture to extort a confession is a different matter." And see Brennan, The Bill of Rights and the States, 36 N. Y. U. L. Rev. 761.

We reiterated that view in *Ashcraft* v. *Tennessee, supra*, where we held that the principle of *Bram* v. *United States*, 168 U. S. 532, 562–563, was applicable to state proceedings. 322 U. S., at 154, n. 9. We said:

"We think a situation such as that here shown by uncontradicted evidence is *so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect* against whom its full coercive force is brought to bear. It is inconceivable that any court of justice in the land, conducted as our courts are, open to the public, would permit prosecutors serving in relays to keep a defendant witness under continuous cross-examination for thirty-six hours without rest or sleep in an effort to extract a 'voluntary' confession. Nor can we, consistently with Constitutional due process of law, hold voluntary a confession where prosecutors do the same thing away from the restraining influences of a public trial in an open court room." 322 U. S., at 154. (Italics added.)

The application of these principles involves close scrutiny of the facts of individual cases. The length of the questioning (*Spano* v. *New York*, 360 U. S. 315), the use of fear to break a suspect (*Malinski* v. *New York*, 324 U. S. 401), the youth of the accused (*Haley* v. *Ohio*, 332 U. S. 596) are illustrative of the circumstances on which

cases of this kind turn. The youth of the suspect was the crucial factor in *Haley* v. *Ohio, supra,* at 599–600:

"What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a. m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning. A photographer was admitted once this lad broke and confessed. But not even a gesture towards getting a lawyer for him was ever made."

The fact that petitioner was only 14 years old puts this case on the same footing as *Haley* v. *Ohio, supra.* There

was here no evidence of prolonged questioning. But the five-day detention—during which time the boy's mother unsuccessfully tried to see him and he was cut off from contact with any lawyer or adult advisor—gives the case an ominous cast. The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.

The prosecution says that the youth and immaturity of the petitioner and the five-day detention are irrelevant, because the basic ingredients of the confession came tumbling out as soon as he was arrested. But if we took that position, it would, with all deference, be in callous disregard of this boy's constitutional rights. He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. To

allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights.

There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested (see *Payne* v. *Arkansas,* 356 U. S. 560, 568) was obtained in violation of due process.

*Reversed.*

MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

As Chief Justice John Marshall said a century and a quarter ago, "[i]f courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined." *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 15 (1831). A 14-year-old boy stands convicted of murder and has been sentenced to imprisonment for life. But, as Mr. Justice Paterson said in *Penhallow* v. *Doane's Admr.,* 3 Dall. 54, 88–89 (1795), "motives of commiseration, from whatever source they flow, must not mingle in the administration of justice."

The Court sets aside the conviction here on due process grounds, finding that the formal confession made by petitioner on January 7 was obtained by "secret inquisitorial processes" and other forms of compulsion. In so doing it turns its back on the spontaneous oral admissions made

by petitioner at the time of arrest on January 1, as well as a detailed confession made the next day, all long before the formal confession was given five days later. Moreover, I find nothing in the record that suggests any "secret inquisitorial processes" were used or any compulsion was exerted upon petitioner even during that longer period. With due deference I cannot see how the Court concludes from the record that petitioner was "cut off from contact with any lawyer or adult advisor" and "made accessible only to the police," that there was a failure to bring him before the juvenile judge in the manner required in juvenile delinquency cases, or that Gallegos' case is in anywise on the same footing with *Haley* v. *Ohio*, 332 U. S. 596 (1948), or the other cases cited by the majority.

As the Court says, "the totality of circumstances" is the only guide we have in confession cases. However, in view of the hop, skip, and jump fashion in which the Court deals with them here, I believe it is first necessary to detail the facts.

The record through the testimony of Officer Chism, a special juvenile officer, shows that on Thursday evening, January 1, he was investigating the assault on Mr. Smith,[1] an 80-year-old man, when he noticed three boys who appeared to fit the description furnished him of the ones involved. The three, who were sitting on the curb outside of Dutchman's Inn, were the Gallegos brothers: petitioner Robert (14), Charles (12), and Richard (8). The officer, who was alone and in street clothes, stopped his car across the street from the inn. He approached the boys, told them he was a police officer, and asked them to come over and sit in his car. They did so and the officer asked them about the Smith assault. Richard orally confessed, and the petitioner "admitted he had a

---

[1] At this time Smith was still alive. He died on January 26, and the murder prosecution here at issue followed.

part in it." Officer Chism then took the boys to Juvenile Hall where the petitioner again admitted his participation, as did his youngest brother, Richard. Both stated that the third brother, Charles, had nothing to do with the matter, but that their cousin, Eddie Martinez, had accompanied them. Charles, having been cleared of any involvement in the assault, was taken home that very evening by Officer Chism, who told Mrs. Gallegos that the petitioner and Richard were being held at Juvenile Hall and that visiting hours were on Monday and Thursday evenings. He also informed her of her sons' right to counsel.

The next evening, January 2, Officer Chism talked to the petitioner, Richard, and Martinez, who by this time was also at Juvenile Hall. As the officer took notes,[2] petitioner again described his participation in the assault on Mr. Smith in the following manner as narrated by Officer Chism at the trial:

"[After his participation in an assault on a Mr. Kruhd,] he proceeded down to 18th and Curtis Street where he was shining shoes . . . . [U]pon seeing an old man, who was later identified as Robert F. Smith, he followed him to a hotel on 18th street. . . . [H]e . . . was with his younger brother, Richard, and one Eddie Martinez. . . . They followed the old man to the hotel and Richard stayed downstairs and watched out for cops. He and Eddie went upstairs and they lost track of the old man; they asked several if they had seen his grandfather come in, that he had just come in and was drunk . . . [and] a man told . . . [them] he just went down the hallway, and upon knocking on the door a man opened the door and he told him he was looking for his grandfather, that he was drunk, and the man told

_____

[2] These notes were signed by petitioner.

58

him the old man next door had just come in. He said upon knocking on the other door someone told him to come in, that he opened the door and he seen it was the man he was looking for. . . . [A]t that time Eddie Martinez asked the old man for a drink of water and when the old man brought the water Eddie grabbed him and he, Robert, hit the old man about the head and face with a shoe brush; that when the old man fell to the floor he took a knife and held it to the old man's throat and took his billfold out [of] his back pocket. . . . [T]hey all left then and went to the Twenty-third Street Viaduct where he gave Eddie $3.00 and he kept $10.00 to split between him and Richard and they then went home . . . ."

That same evening, January 2, at 11:30 p. m., Mrs. Gallegos attempted to visit her two sons at Juvenile Hall but was again informed that visiting hours were 7 p. m. to 8 p. m. on Mondays and Thursdays. At the trial she testified that she made no effort to see her sons on the next visiting day, which was Monday, but waited until Thursday January 8.

The record shows that on January 3 the officer filed in the juvenile court a detailed report of the arrest and petitioner's confessions together with a petition charging petitioner with juvenile delinquency. This was supplemented on the 5th by the report of the Kruhd assault and Kruhd's identification of petitioner and the other boys. The officer followed, as he was obliged to do, the juvenile court law of Colorado which provides for commitment in Juvenile Hall, report to the juvenile judge who supervises the Hall and its inmates, and the filing of a delinquency petition.

For the first few days at Juvenile Hall petitioner was placed in "security," which meant that he did not participate in the school program. The uncontradicted testi-

mony of the Hall Superintendent was that the decision to keep the petitioner out of the program was made by his unit supervisor in order to size up the boy, who had been charged with a serious crime, before placing him in the regular activities with the others. During this time he had all his meals with the other boys and conversed with his younger brother who was held in another ward. Although the petitioner did not testify at the trial in the presence of the jury, he admitted at a hearing held to determine the admissibility of the formal confession that he was only questioned three times between January 1 and January 7 and that no threats or physical coercion was used at any time.

On January 7 the police department sent a man over to formalize the earlier confessions. Officer Miller, who took the confession, testified that he told petitioner of the possibility of a murder charge, warned him that he did not have to make a statement, and told him that he could have his parents and an attorney present if he desired. Petitioner indicated that he did not so desire, and a formal confession was taken which was substantially identical to the statement given on January 2, as related by Officer Chism in his testimony. The confession was typed, and Officer Chism took it over to Juvenile Hall for petitioner to sign. He testified that petitioner read it aloud before signing it. Above his signature was the admission that the confession was made voluntarily and upon warning that it could be used against him.

On January 16 the three assailants were committed to the Industrial School by the juvenile court. Upon the death of Mr. Smith, petitioner on information was tried for murder. As noted above, the evidence included testimony of his admissions upon arrest and his confession on January 2, as well as the formal confession of January 7. These were admitted after independent findings of

60

voluntariness by the trial judge and jury.  The latter was instructed that in determining whether petitioner freely and voluntarily made the confessions it was to take into account "the age, maturity, physical and mental condition of the defendant, the length of his confinement, his opportunity or lack of opportunity to seek friendly or professional aid, the advice or lack of advice given him as to his constitutional rights, and all other facts and circumstances surrounding such confession."

Before discussing the admissibility of the formal confession of January 7, I must first comment on the Court's treatment of the earlier confessions, viz., those of January 1 and 2.  Although the Court carefully refrains from holding these confessions inadmissible under due process standards, its innuendo that they were acquired "in callous disregard of this boy's constitutional rights" cannot pass unexposed.  In regard to these confessions, the test of voluntariness as evidenced by the "totality of circumstances" leads the Court not to question them. Here there were no "secret inquisitorial processes" or compulsion of any kind as the Court envisions in relation to the confession of January 7.  The Court's only criticism is that petitioner "would have no way of knowing what the consequences of his confession were without advice as to his rights . . . ." [3]  The truth of the matter is that the singular circumstance pointed out by the Court has never been thought to render a confession inadmissible.  See *Culombe* v. *Connecticut,* 367 U. S. 568, 577–602 (1961) (opinion of Mr. Justice Frankfurter).

---

[3] There is no basis for the Court's suggestion that the officers improperly failed to bring petitioner before the juvenile judge when they first arrested him.  The procedure used in Denver of filing a report with the juvenile judge and temporarily placing the offender in Juvenile Hall pending a hearing is in keeping with advanced procedures being followed with reference to juvenile offenders throughout the United States.

The Court is overturning petitioner's conviction because it flows in part from the formal confession of January 7. I cannot draw from this record a conclusion that this confession was involuntary. Petitioner freely admitted in testimony before the trial judge that he was not threatened or physically coerced in any way and that he was not intensively questioned. Moreover, prior to the formal confession he was told that he did not have to make a statement and warned of the possibility of a murder charge, as well as informed that he could have an attorney and his parents present. Officer Chism's testimony as to this matter was documented by the confession itself which recites that it was voluntary and given after notice that it could be used against him.

Petitioner was never placed in solitary confinement, as might be implied from the Court's opinion, but was merely kept out of the organized activities until the unit supervisor could determine whether his full-time participation would have an adverse effect on others. And even under this schedule he had all his meals with the other boys and conversed freely with them.

Nor was petitioner "cut off" from contact with lawyers or adults and "made accessible only to the police." His mother made no effort to obtain an attorney although informed of the right to do so.[4] And she was not prevented from seeing him but was merely asked to comply with reasonable visiting regulations. She was informed on two occasions that she could see him Monday, January 5, two days before the formal confession which the Court finds invalid, but she did not attempt to do so. And petitioner himself passed up the offer to confer with his parents and an attorney before making this confession.

In support of the above factors indicating that the confession of January 7 was voluntary is the undeniable fact

---

[4] Indeed, no attorney was obtained for petitioner's trial in the juvenile court.

62

that petitioner admitted on January 1 his participation in the assault and confessed in detail thereto on January 2. Both of these statements occurred prior to the events which the Court finds to have coerced the confession of January 7. I am hard pressed to understand how one could conclude that the police found it expedient to coerce the January 7 confession or that the events discussed by the Court rendered it involuntary when five days earlier a substantially identical confession was made in the absence of the "coercive" events.

As I have noted, in light of these facts I cannot conclude that this confession was involuntary. *A fortiori,* I could not determine, as the Court must, that so clear a case of coercion was made out that three prior findings that the confession was voluntary—including one by the jury which was specifically instructed to consider each of the factors relied on by the majority—can be reversed. I have carefully examined the cases upon which the Court relies and can find not one among them which in the least is apposite. There were no "secret inquisitorial processes" as in *Chambers* v. *Florida,* 309 U. S. 227 (1940). There Chambers, a Negro, for a week after arrest was kept *incommunicado,* moved from one jail to another, constantly questioned, and was finally subjected to around-the-clock interrogation by a relay of from 4 to 10 persons. Nor does *Leyra* v. *Denno,* 347 U. S. 556 (1954), in any way resemble this case. There the accused had requested a doctor in order to get relief from a painful sinus attack. The police brought in a psychiatrist who by subtle means induced him to confess after an hour or two of questioning. The state court found this confession invalid because of mental coercion. However, at the second trial subsequent confessions were admitted in evidence. This Court held that the psychiatric inducement used to extract the first confession poisoned and invalidated the subsequent ones. Likewise, the reference of the Court to Chief Jus-

tice Hughes' statement in *Brown* v. *Mississippi*, 297 U. S. 278, 285 (1936), concerning the "element of compulsion which is condemned by the Fifth Amendment," is misleading and inapposite. "The question in this case," he said in *Brown* with his usual conciseness, "is whether convictions, which rest solely upon confessions shown to have been extorted by officers of the State by brutality and violence, are consistent with the due process of law required by the Fourteenth Amendment of the Constitution of the United States." *Id.*, at 279. Brown and the other suspects, the Chief Justice pointed out, had been stripped, laid over chairs and beaten with a leather strap with buckles until their backs were cut to pieces and they confessed. Nor does the holding in *Ashcraft* v. *Tennessee*, 322 U. S. 143 (1944), have any bearing on this case. It also involved "prosecutors serving in relays" keeping a person under continuous cross-examination for 36 hours without rest or sleep. Nor can it, in my view, be said that *Spano* v. *New York*, 360 U. S. 315 (1959), has any weight under the facts here. In that case continuous, all-night cross-examination by four officers, the refusal of repeated requests to consult his counsel, together with the use of an old friend who was a fledgling police officer as bait to break down the accused, led us to invalidate the confession. And in *Malinski* v. *New York*, 324 U. S. 401 (1945), the accused was stripped of his clothing and his request for counsel ignored while he remained in solitary confinement and without food until, led to believe that he was going to get a "shellacking," he confessed from apparent fear of his jailors. Finally, I see no similarity in *Haley* v. *Ohio*, 332 U. S. 596 (1948), the last case cited by the Court. There a 15-year-old boy never before in trouble was questioned "through the dead of night" by five to six policemen in relays of one or two each and then only was led to confess by being shown alleged statements of two confederates incriminating him.

64

*Haley* does not indicate that youth alone is sufficient to render a juvenile's confession inadmissible. Here we do not have any of the factors which led to the comment: "What transpired would make us pause for careful inquiry if a mature man were involved." *Id.*, at 599.

I regret that without support from prior cases and on the basis of inference and conjecture not supported in the record the Court upsets this conviction.