**UNITED STATES of America ex rel. James CROWSON**

v.

**Joseph R. BRIERLEY, Superintendent.**

**Misc. No. 3406.**

United States District Court
E. D. Pennsylvania.

Oct. 17, 1968.

Norman Ashton Klinger, Philadelphia, Pa., for petitioner.

Arlen Specter, Dist. Atty., and Welsh S. White, and Michael J. Rotko, Roger F. Cox, Asst. Dist. Attys., Philadelphia, Pa., for respondent.

## OPINION AND ORDER

BODY, District Judge.

### I.

Relator petitions this Court for a writ of habeas corpus based upon his claims that his confession to complicity in murder was obtained illegally and that therefore his plea of guilty was induced illegally. Having carefully considered relator's claims, the briefs of counsel, and evidence adduced at the original trial and two full hearings on this petition, this Court believes the claims have not been proven by the relator and that it must therefore deny the relief requested.

Relator has been confined in a state institution under a life sentence imposed on September 9, 1957. In 1965, after a full evidentiary hearing before Judge Gold, relator was denied a writ of habeas corpus for practically the same claims presented before this Court.[1]

Two evidentiary hearings were held before this Court on December 9, 1966 and January 23, 1967. While retaining jurisdiction, this Court ordered a de novo certification hearing in the Quarter Sessions Court of Philadelphia to determine the validity of the original binding over from the Juvenile Court, where relator had not been represented by counsel. On May 10, 1968 Judge Jamieson handed down his decision following the de novo certification hearing, stating inter alia that "even without the confession, the remaining testimony establishes a prima facie case of murder."[2]

### II.

On Thursday, July 25, 1957, at about 8:45 A.M., a druggist was shot in his store by three youths attempting a robbery. The weapon used was a sawed-off shotgun which was later found behind a co-defendant's house. That evening at about midnight, relator was picked up by police at his home and taken to a police station. Relator's mother had called police earlier Thursday to report her son to be missing since he had failed to come home Wednesday night. Relator was questioned until about 5:00 A.M. Friday morning, July 26, about the drugstore stick-up and murder. Relator denied any involvement and was released without being charged.

Relator contends for the first time before this Court that "they [police] smacked me, and one of them had a stick and kept hitting me on my knees with it every now and then and on my legs. That was about it."[3]

At about 2:20 A.M. Saturday morning, July 27, approximately twenty-two hours after being released on Friday morning, the police again picked up the relator at his home. He was brought to City Hall, Room 117, where he was questioned by at least three police officers. A co-defendant in the case, Isaiah Green, was already at City Hall in police custody in a different room. Sometime between 3:15 A.M. and 4:00 A.M. Saturday morning, relator gave the police an oral confession. The relator testified that the questioning before he gave police his oral confession, lasted between one-half hour and one hour.[4]

At about 4:00 A.M. Green began giving answers for a written statement in the presence of the relator Crowson. Some time later Edwin Walker, a co-defendant, was brought in. Green finished his written confession at about 5:00 A.M. The questions and answers were typewritten by the police. The police began relator's confession at about 6:00 A.M. Walker's confession was written after relator's. At about 8:00 A.M. each defendant signed all three typewritten confessions which had been given in each others' presence and which

1. Commonwealth ex rel. Crowson v. Rundle, Q.S. Phila., Sept. 1964, No. 2466 (3/31/65).

2. Commonwealth of Pennsylvania v. Crowson, Q.S. Phila., July Sessions 1957, No. 1434 (5/10/68).

3. N.T. 40 (December 9, 1966).

4. N.T. 43 (December 9, 1966).

were consistent in all important particulars.

The only warning given to relator with respect to his Constitutional rights was given before he signed his written confession. It stated:

"We want to warn you that anything you say may—or sign—can and will be used for or against you at the time of trial in court. Knowing this, are you still willing to make a voluntary statement."[5]

The relator stated that he understood the warning which was given to him orally.[6] The confession was read to the three-judge court which determined the degree of guilt.

## III.
## CONFESSION

 This Court believes that relator's confession was neither coerced nor involuntary. The relator, himself, specifically stated that no physical force was used during the questioning on Saturday from which the confession emanated.[7] However, relator contends that he was beaten by the police on Friday morning and argues that this somehow coerced the confession obtained a day later.

It is very difficult for this Court to accept relator's claim that he was beaten Friday morning. He waited eight years to tell a lawyer about it. The relator did not mention it to his trial attorneys, Louis F. McCabe and Joel H. Weinrott, nor apparently to his attorneys, Vincent J. Ziccardi, Herman I. Pollock and Allan Stotsenberg of the Defender Association who represented him in his petition before Judge Gold of the Court of Common Pleas of Philadelphia County in 1964. Relator bears a considerable burden considering the fact that he waited through eight years and several proceedings before disclosing the facts about the physical abuse he received from the police. See United States ex rel. Darrah v. Brierly, 290 F.Supp. 960 (E.D.Pa., October 10, 1968).

Notwithstanding the alleged physical abuse, it is very hard, indeed, to conclude that what happened on Friday morning could coerce a confession on Saturday morning, especially in light of relator's release to the community following Friday morning's questioning. The events are sufficiently remote so as to have no legal significance to each other in respect to the confession obtained. It should be noted that before being released Friday morning, the relator had denied any involvement and had in no way implicated himself with the murder.

This Court believes that the relator readily understood the questions put to him during the making of the written confession.[8] The questions were not at all difficult or tricky so that a fifteen year old youth would not know exactly to what he was giving answers.

The relator's claims that he was dizzy during the questioning due to a combination of smoke-filled rooms and a blow he received on his head a few days before the questioning are very speculative and were not sufficiently proven. There is no evidence that relator complained to either the police or his attorneys at that time about his dizziness. It is simply too tenuous to hold that under these circumstances relator's volitional and cognitive functions were so impaired as to make his written confession involuntary. In addition, whether the relator was fed or not by the police does not rise to the level of a Constitutional question under the specific facts of this case.

Without resolving the factual question of how long the relator took to read his confession, whether it was ten minutes or longer, this Court finds that relator knowingly and wilfully signed it.[9] Relator had more than ample time to reflect on what he signed since he was also

---

5. N.T. 51 (December 9, 1966).

6. N.T. 51 (December 9, 1966).

7. N.T. 55, 56 (December 9, 1966).

8. N.T. 48–54 (December 9, 1966).

9. There is no indication that the relator was unable to take as much time as he wanted to read his confession. N.T. 34 (December 9, 1966).

present at the taking of the written confessions of both Green and Walker.[10] Relator stated that he understood most of the questions asked of him and that any he did not understand were explained by the police.[11]

Relator cites Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) and Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed.224 (1948), in his brief for the proposition that his confession was illegally obtained. This Court observes certain similarities but does not find these cases controlling in the instant case. In *Gallegos* the Supreme Court was deeply concerned about the detention of a 14-year old boy for five days, during which time he was prohibited from seeing his visiting mother and after which time the juvenile signed a formal written confession. In addition, the boy was not brought before the Juvenile Court for several days. The Supreme Court in the *Haley* case placed emphasis on the lengthy grilling procedures used by the police in obtaining the oral confession. In the instant case the questioning preceding the oral confession lasted between one-half hour and one hour and the written confession was begun about 6:00 A.M., after Green had given his written confession and attempts were made to iron out inconsistencies in the three confessions. A lengthy, constant grilling simply does not appear from the record in this case.

■ Although relator was not warned of his right to counsel in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), this right has been held by the Supreme Court not to be applied retroactively in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). *Miranda* has not been expressly applied to juveniles although In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) leaves little question that it will be. Of critical importance in juvenile cases is

that the family be given notice of an arrest. In this case relator's mother was present when the police picked her son up for the second time.

## IV.

### GUILTY PLEA

This Court believes that the confession was legally obtained and therefore could in no way taint his guilty plea to murder generally.

■ Even if the confession were deemed either involuntary or coerced, the relator has not borne his burden of proving that the confession primarily motivated the guilty plea. Commonwealth v. Garrett, 425 Pa. 594, 229 A.2d 922 (1967). There were several other considerations besides the confession which weighed on the relator's lawyers' minds. One was the great deal of public alarm about the shooting.[12] Relator's lawyers were very mindful of the possibility that the death sentence would be imposed on relator. As a matter of fact, relator's co-defendant Green did receive a death sentence which was commuted later.

Mr. Weinrott stated that he had talked with the three-judge court and "that I sort of left the meeting with the feeling that if a plea was entered, a guilty plea on behalf of Mr. Crowson, the penalty would be less than death."[13] The threat of the electric chair was very real to Mr. Weinrott.[14]

Another element in Mr. Weinrott's strategy was the fact that a Mr. Poehlman was an eyewitness to the incident at the drugstore. At trial Mr. Poehlman identified all three co-defendants.

The plea of guilty was discussed by counsel among themselves and with the defendant before trial.[15] There is no substantive evidence that the guilty plea was forced upon the relator. In fact, relator was given a chance to speak in open

---

10. N.T. 55 (December 9, 1966).

11. N.T. 47 (December 9, 1966).

12. N.T. 114 (January 23, 1967).

13. N.T. 126, 127 (January 23, 1967).

14. N.T. 136 (January 23, 1967).

15. N.T. 117 (January 23, 1967).

court before sentence was pronounced and he said nothing. After the court found all three co-defendants guilty of murder in the first degree, relator readily admitted to the court his full participation in the robbery and murder.[16] The evidence of guilt in this murder case is overwhelming.

## ORDER

And now, this seventeenth day of October 1968, it is ordered that the petition of James Crowson for a writ of habeas corpus be and the same is denied. There is probable cause for appeal.

16. N.T. 177–185 (September 4, 1957).