499 S.E.2d 876

**In the Matter of Steven William T.**

**No. 23976.**

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 15, 1997.

Decided Dec. 16, 1997.

Aaron C. Amore, Public Defender, Martinsburg, for Steven William T.

Michael D. Thompson, Prosecuting Attorney, Bernice Weinstein, Assistant Prosecuting Attorney, Charles Town, for the State.

WORKMAN, Chief Justice:

Steven William T.,[1] (hereinafter "Appellant" or "Steven") a juvenile, appeals the decision of the Circuit Court of Jefferson County transferring Steven to adult jurisdiction after Steven was charged with first degree murder. On appeal, he contends that the lower court erred in transferring him to adult status. We reverse and remand for further proceedings consistent with this opinion.

---

1. We follow our traditional practice in child abuse and neglect matters, and other cases involving sensitive facts, and do not use the last names of the parties. *See, e.g., In the Matter of Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991); *State ex rel. Division of Human Servs. by Mary C.M. v. Benjamin P.B.,* 183 W.Va. 220, 395 S.E.2d 220 (1990).

## I.

### FACTUAL BACKGROUND

On June 19, 1995,[2] Ms. Judy Jenkins was murdered in her own home by two gunshot wounds to the head. Initial investigation centered upon Mr. Johnson Lykens, a married man with whom Ms. Jenkins had allegedly had an affair, and Ms. Barbara Milburn, who had lived with Ms. Jenkins for many years. Although Steven, age fourteen at the time of the murder, was the biological son of Ms. Milburn's sister, Priscilla T., Steven had resided with Ms. Milburn for most of his life.[3] During the initial investigation, Steven reported that he had been awakened by the sound of gunshots and had seen Ms. Milburn when he awoke. He also reported that he had seen Mr. Lykens with Ms. Jenkins' gun approximately six months prior to the fatal shooting.

On December 18, 1995, during the course of an investigation regarding alleged arson on her property, Ms. Milburn confessed to the arson and the murder of Ms. Jenkins. In her confession, Ms. Milburn accepted full responsibility for the murder and indicated that Steven had assisted her in the disposal of the gun by throwing it into the Shenandoah River.

### A.

#### *Steven's First Statement*

On December 19, 1995, at approximately 8:00 a.m., police began questioning Steven at the Jefferson County State Police barracks in Charles Town, West Virginia. Three people were present with Steven when he arrived at the police barracks: his biological mother, Priscilla T., who had voluntarily relinquished custody to Ms. Milburn when Steven was a baby; Ms. Carla Whetzel, a friend of Ms. Milburn's who had moved in with Ms. Milburn in October 1995[4]; and Christine T., Steven's sister. Based upon the December 4, 1995, document signed by Ms. Milburn allegedly transferring custody of Steven to Ms. Whetzel if "anything happened" to Ms. Milburn, Trooper Jose Centano of the West Virginia State Police believed that Ms. Whetzel was Steven's legal custodian. Trooper Centano asked both Priscilla T. and Ms. Whetzel to remain in the room during the interview, but Priscilla T. and Christine chose not to remain in the room. Steven's *Miranda*[5] rights were explained to him, he initialed each right as it was specified to him, and Ms. Whetzel also signed the rights form. Ms. Whetzel consented to having the police take Steven's statement, and she was present during the questioning.

By approximately 8:20 a.m., Steven admitted that he had assisted Ms. Milburn in the disposal of the gun. He indicated that Ms. Milburn had awakened him and had informed him that she had shot Ms. Jenkins. He also reported that Ms. Milburn had instructed him to get out of bed and go with her in the car to a bridge over the Shenandoah River.

---

**2.** The State's brief erroneously references that date of the shooting as June 19, 1996, and the Appellant's brief states that the shooting occurred on June 20, 1995. From the record and transcripts before us, we have concluded that June 19, 1995, is the correct date.

**3.** The legal status of Steven's guardianship is unclear. The State informs this Court that Steven's natural mother, Priscilla T., had voluntarily relinquished custody of Steven to her sister, Barbara Milburn, when Steven was three months of age (the Appellant's brief suggests that Steven was only three weeks of age when the transfer of custody occurred.) That transfer of physical custody was apparently confirmed by a court in Fairfax County, Virginia, at some point subsequent to the transfer. The natural mother did not, according to the State, relinquish her rights to Steven, and her parental rights were not terminated. The State informs the Court that Ms.

Milburn had signed a handwritten document on December 4, 1995, purporting to transfer custody of Steven to her friend, Ms. Carla Whetzel, in the event that anything happened to Ms. Milburn. The Appellant's brief refers to Steven as Ms. Milburn's "foster son" and alleges that Ms. Priscilla T. had not seen Steven for about four years prior to June 1995.

**4.** The decedent, Judy Jenkins, had allegedly maintained an intimate relationship with her cohabitant in the home, Barbara Milburn. Subsequent to Ms. Milburn's death, Carla Whetzel moved into the home and allegedly began an intimate relationship with Ms. Milburn. These alleged relationships are set forth because they become relevant to the legal issues discussed herein.

**5.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

According to Steven's statement, Ms. Milburn then allegedly instructed Steven to throw the gun into the river. This first interview apparently concluded at approximately 10:00 a.m. Trooper Centano testified that although he believed that he had sufficient information to arrest Steven as an accessory after the fact, he did not know whether Steven had told him the truth since Steven had lied to him in the initial inquiry into the murder.

Trooper Centano admitted during the transfer hearing that he had probable cause to arrest Steven for the aiding and abetting charge after the first confession. However, when asked what "more" he needed after that first confession, he replied that he wanted "[t]he truth" and was interested in what other crimes Steven may have committed. Trooper Centano even informed Steven after the first confession that he was being charged with the crime of aiding and abetting. Trooper Centano also testified at the transfer hearing that he was "confused" after Steven's confession to aiding and abetting and that he telephoned the prosecuting attorney, Michael Thompson, to determine what evidence he needed as a prerequisite to charging Steven with aiding and abetting murder. Trooper Centano testified that Mr. Thompson raised the issue of whether Trooper Centano believed that Steven was telling the truth. During the preliminary hearing, Trooper Centano testified that "based on his knowledge of the law, defendant's statement was sufficient to charge someone with aiding and abetting but then again, the object of the investigation was the murder, not just the aiding and abetting."

Based upon Trooper Centano's determination that discrepancies existed in Steven's statement and the trooper's belief that Steven had not revealed the entire truth, Trooper Centano asked Steven if he would be willing to take a polygraph test. Steven consented to the polygraph test after discussing the issue with Priscilla T. and Ms. Whetzel. Trooper Centano contacted Trooper Mark Carte of the Martinsburg detachment and requested assistance in administering a polygraph test to Steven. At approximately noon[6] on December 19, 1995, Trooper Carte arrived and spoke with Steven alone for approximately thirty to forty minutes. Trooper Carte's notations regarding the interview, as read by Trooper Carte during the transfer hearing, reveal that "Steven became emotional and started crying during the pre-test interview. Steven was observed to sit staring at the floor placing his head down in his hands at points of the interview." The session with Trooper Carte ended when Steven refused to undergo the polygraph test.

### B.

### Steven's Second Statement

Subsequent to Steven's refusal to take the polygraph test, Trooper Centano entered the room and asked Steven if he wanted to talk. According to the statement of Trooper Centano, Steven asked to speak with Trooper Centano privately. Ms. Whetzel and Steven's biological mother left the room crying, and they later testified that they knew as they exited the room that Steven was going to confess to the murder of Ms. Jenkins. According to the testimony of Trooper Centano, once Steven and Trooper Centano were alone in the room, Steven began crying again and told Trooper Centano that he had "helped." When Trooper Centano asked him what he meant by "helped," Steven began attempting to say something which Trooper Centano was unable to understand due to Steven's crying. When Steven finally stated that he had shot Judy Jenkins, Trooper Centano asked both Ms. Whetzel and Steven's biological mother to return to the room. At approximately 1:30 p.m., in the presence of Ms. Whetzel and his biological mother, Steven provided a second statement in which he stated that he had fired the first shot that hit Judy Jenkins. He explained that he had fired that shot while Ms. Jenkins was sleeping in her bed. He then explained that he had taken the gun to Ms. Milburn because he

---

6. Trooper Carte's trip from Martinsburg to Charles Town took approximately one hour due to snow and dangerous road conditions. The preparation of the polygraph equipment required approximately one additional hour. During this two-hour period, Steven was free to get something to eat or drink and speak with his family.

was unable to shoot Ms. Jenkins a second time. Steven explained that he and Ms. Milburn watched Ms. Jenkins get up and go into the bathroom. According to Steven's statement, Ms. Milburn then allegedly told Steven to go to the camper, and Ms. Milburn thereafter shot Ms. Jenkins a second time.[7]

Due to inclement weather conditions, Trooper Centano had to travel to the home of a magistrate in order to present Steven before the magistrate. This occurred between 2:00 and 3:00 p.m. on December 19, 1995.

## C.

### Transfer to Adult Jurisdiction

During a psychological evaluation with clinical psychologist Dr. F. Scott Bailey in May 1996, Steven informed Dr. Bailey that he had confessed to the murder in order to protect Ms. Milburn and that Ms. Whetzel had encouraged him to take the blame.[8] He further maintained that his original statement was true: he had been awakened by the sound of gun shots and Ms. Milburn had come to him, told him that she had shot Judy, and that she needed help disposing of the gun. Steven further disclosed that although he had personally made the decision to take the blame, Ms. Whetzel had coached him regarding exactly what to tell the police.[9] Steven also stated that he had only admitted to shooting Ms. Jenkins because of pressure from Ms. Whetzel. Dr. Bailey tested Steven and concluded that Steven has an average intelligence and an IQ of 95. Dr. Charles Cantone, Steven's retained psychologist, measured Steven's IQ as 76, evidencing a borderline range of intelligence. Dr. Cantone explained that he believed that the 76 IQ was a depressed estimate and that Steven actually functioned in the low normal range.

On June 7, 1996, the lower court held a hearing on Steven's motion to suppress the

confession, and on June 11, 1996, the transfer hearing was held. The lower court determined that Steven's confession was admissible and that the State had shown probable cause to believe that Steven had committed the act of first degree murder. The lower court further reasoned "[t]hat whether the juvenile herein by his confession was his attempt to aid the adult co-defendant, Barbara Milburn, would go to the weight to be given to his statements and confession and can not be laid at the State's feet." The lower court further found that "any delay was not for an impermissible purpose; That December 19, 1995 was a snowy day, closing the Magistrate Court; that the request for a polygraph of the juvenile herein following his first statement of December 19, 1995 was for the purpose of resolving conflicts in said statement of the juvenile...." Steven was thereafter transferred to adult jurisdiction in accordance with West Virginia Code § 49-5-10(d)(1) (1996).

## II.

### STANDARD OF REVIEW

■ This Court's appellate review of a juvenile transfer order examines the findings of fact and conclusions of law upon which the lower court founded its transfer decision. In syllabus point one of *In re H.J.D.*, 180 W.Va. 105, 375 S.E.2d 576 (1988), we explained as follows:

"Where the findings of fact and conclusions of law justifying an order transferring a juvenile proceeding to the criminal jurisdiction of the circuit court are clearly wrong or against the plain preponderance of the evidence, such findings of fact and conclusions of law must be reversed. W.Va.Code, 49-5-10(a) [1977] [now, 49-5-10(e) [1996]]." Syl. pt. 1, *State v. Bannister*, 162 W.Va. 447, 250 S.E.2d 53 (1978).

---

7. Steven's confession to firing the first shot comports with physical evidence found at the crime scene. The investigating officers had believed that the two wounds on Ms. Jenkins' body had been inflicted at different times, and there was blood in the bathroom when the police arrived. Those aspects of the crime scene had conflicted with Ms. Milburn's confession to the crime.

8. This revelation to Dr. Bailey was apparently Steven's first deviation from the version of the story he provided in his confession.

9. The State emphasizes that Steven had knowledge of details of the crime scene that Ms. Whetzel, not present at the crime scene, could not have had.

180 W.Va. at 106, 375 S.E.2d at 577, syl. pt. 1.

█ In *In re Anthony Ray Mc.*, 200 W.Va. 312, 489 S.E.2d 289 (1997), we explained that de novo review is appropriate under certain circumstances. *Id.* at 317–18, 489 S.E.2d at 294–95. Syllabus point one of *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995), for instance, provides that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a de novo standard of review." *Id.* at 139, 459 S.E.2d at 416, syl. pt. 1.

█ Syllabus point two of *State v. Hosea*, 199 W.Va. 62, 483 S.E.2d 62 (1996), also provides the following guidance:

The Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession was obtained as a result of the delay in the presentment of a juvenile after being taken into custody before a referee, circuit judge, or a magistrate when the primary purpose of the delay was to obtain a confession from the juvenile. The factual findings upon which the ultimate question of admissibility is predicated will be reviewed under the deferential standard of clearly erroneous.

*Id.* at 64, 483 S.E.2d at 64, syl. pt. 1.

## III.

### PROMPT PRESENTMENT

█ Steven contends that probable cause existed at approximately 8:20 a.m. for the aiding and abetting charge and that the police should have presented him to the magistrate at that time. He further asserts that the lower court erred in finding no improper purpose or unreasonable delay in presenting Steven to the magistrate. West Virginia Code § 49–5–8(d) (1996) [10] requires prompt presentment of juveniles to the magistrate and provides as follows:

A child in custody must immediately be taken before a referee or judge of the circuit court and in no event shall a delay exceed the next succeeding judicial day: Provided, That if there be no judge or referee then available in the county, then such child shall be taken immediately before any magistrate in the county for the sole purpose of holding a detention hearing. The judge, referee or magistrate shall inform the child of his or her right to remain silent, that any statement may be used against him or her and of his or her right to counsel, and no interrogation shall be made without the presence of a parent or counsel. If the child or his or her parent, guardian or custodian has not retained counsel, counsel shall be appointed as soon as practicable. The referee, judge or magistrate shall hear testimony concerning the circumstances for taking the child into custody and the possible need for detention in accordance with section two, article five-a of this chapter [§ 49–5A–2]. The sole mandatory issue at the detention hearing shall be whether the child shall be detained pending further court proceedings. The court shall, if advisable, and if the health, safety and welfare of the child will not be endangered thereby, release the child on recognizance to his or her parents, custodians or an appropriate agency; however, if warranted, the court may require bail, except that bail may be denied in any case where bail could be denied if the accused were an adult.

In syllabus point three of *State v. Ellsworth J.R.*, 175 W.Va. 64, 331 S.E.2d 503 (1985), we examined the requirements of West Virginia Code § 49–5–8(d) and explained as follows:

Under W. Va.Code, 49–5–8(d), when a juvenile is taken into custody, he must immediately be taken before a referee, circuit judge, or magistrate. If there is a failure to do so, any confession obtained as a result of the delay will be invalid where it appears that the primary purpose of the delay was to obtain a confession from the juvenile.

175 W.Va. at 66, 331 S.E.2d at 504, syl. pt. 3. In *Hosea*, the juvenile had challenged the

---

10. West Virginia Code § 49–5–8(d) was amended in 1977. Those amendments were not in effect at the time of Steven's case, and they do not substantially alter the method of presentment to the magistrate.

admission of his confession given prior to presentment to a magistrate under West Virginia Code § 49–5–8(d). 199 W.Va. at 64, 483 S.E.2d at 64. In affirming the *Hosea* transfer, this Court reasoned that the delay during which the confession was obtained prior to presentment was not, in the language of *Ellsworth,* for the primary purpose of obtaining a confession. *Id.* at 69, 483 S.E.2d at 69. As we stated in *Hosea,* "the issue to address is whether the primary purpose for the delay between the time the defendant was taken into custody and the time of his presentment to a magistrate was to obtain a confession from the defendant." *Id.* Additionally, as we expressed in *State v. Sugg,* 193 W.Va. 388, 456 S.E.2d 469 (1995), "[i]n determining the reasonableness of the delay, the significant period of detention is that which occurs before the confession and not thereafter." *Id.* at 396, 456 S.E.2d at 477 n. 7.

In syllabus point two of *State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613 (1986), dealing with the prompt presentment rule in the adult context, defines the moment at which the prompt presentment rule is triggered and provides, in pertinent part, that "[o]nce a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is also triggered." *Id.* at 265, 351 S.E.2d at 614, syl. pt. 2, in part.

In the present case, the Appellant contends that sufficient probable cause to arrest him for the charge of accessory after the fact existed at approximately 8:20 a.m. Thus, pursuant to the Appellant's argument, the prompt presentment rule was triggered at that time. The confession to the murder was obtained at approximately 1:30 p.m., and Steven was presented to the magistrate at approximately 3:00 p.m.. Thus, the period of delay most significant to our inquiry is the five hours between the initial existence of probable cause and the murder confession.

This Court has previously stated that the State bears the burden of proof that the primary purpose of any delay in the presentment was not to obtain a confession. In syllabus point six of *State v. Moss,* 180 W.Va. 363, 376 S.E.2d 569 (1988), we explained that " '[t]he State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case.' Syl. Pt. 5, *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975)."

The critical issue is the purpose for the delay. In our de novo review of that question, we find that the primary purpose of the delay in the present case was to obtain a confession. Once the police had probable cause to arrest Steven, the prompt presentment rule was triggered, and he should have been taken before a magistrate. The legislative mandate, embodied in West Virginia Code § 49–5–8(d), does not permit continued exploration subsequent to the existence of probable cause to arrest. Trooper Centano testified that he believed he had enough information after the first interview to arrest Steven as an accessory after the fact. Trooper Centano's misgivings concerning the truth of Steven's statements does not negate the fact that probable cause to arrest existed by 8:20 a.m., and certainly by the conclusion of that interview at 10:00 a.m. We further find that the confession to murder, obtained at approximately 1:30 p.m., was obtained as a result of the delay in presentment. We therefore conclude that the confession to murder should have been suppressed and should not have been permitted as evidence at the transfer hearing.

## IV.

### ADDITIONAL IRREGULARITIES

Steven also attacks the validity of the confession based upon his allegation that the confession was not knowingly, voluntarily, and intelligently made and did not comply with the requirements of West Virginia Code § 49–5–2(1) (1996). While we invalidate the confession based upon our prompt presentment discussion above, we also address several unorthodox facets of Steven's confession to murder. In *Sugg,* we emphasized that a confession of a minor must be scrutinized under totality of circumstances to determine whether statement was voluntarily, knowingly, and intelligently made. 193 W.Va. at 397,

456 S.E.2d at 478. In *State v. Laws*, 162 W.Va. 359, 251 S.E.2d 769 (1978), we recognized numerous factors to be evaluating in determining the voluntariness of a juvenile confession. *Id.* at 363, 251 S.E.2d at 772. These factors include:

> 1) age of the accused; 2) education of the accused; 3) knowledge of the accused as to both the substance of the charge, if any has been filed, and the nature of his rights to consult with an attorney and remain silent; 4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; 5) whether the accused was interrogated before or after formal charges had been filed; 6) methods used in interrogation; 7) length of interrogations; 8) whether vel non the accused refused to voluntarily give statements on prior occasions; and 9) whether the accused has repudiated an extra judicial statement at a later date.

*Id.* (quoting *West v. United States*, 399 F.2d 467, 469 (5th Cir.1968), *cert. denied*, 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969)).

Applying those factors to the present case, we have a fourteen-year-old individual whose prior experiences had allegedly included instances of physical, emotional, and sexual abuse by the decedent, Ms. Jenkins.[11] Dr. Cantone reported that Steven's emotional development was approximately that of a child of eleven or twelve. Steven had no experience with legal charges or juvenile proceedings, and his mental capacity, according to the IQ testing by Dr. Cantone, was below average. Subsequent to his confession, he repudiated his statements, explaining that he had confessed based upon Ms. Whetzel's attempts to convince him to protect Ms. Milburn.

### A.

### *Consent by Parent or Custodian*

 The most troubling aspect of the confession is the fact that there appears to

have been no meaningful parental protection and guidance available to Steven such as envisioned by the statutory provision requiring the presence and consent of a parent or custodian for the taking of the statement of a juvenile under sixteen-years-old. West Virginia Code § 49–5–2(1) (1996) provides as follows:

> (1) Extrajudicial statements, other than res gestae, which were made by a juvenile under fourteen years of age to law-enforcement officials or while in custody shall not be admissible unless such statements were made in the presence of the juvenile's counsel. Extrajudicial statements, other than res gestae, which were made by a juvenile who is **under sixteen years of age but above the age of thirteen** to law-enforcement officers or while in custody, shall not be admissible unless made in the presence of the juvenile's counsel **or made in the presence of, and with the consent of, the juvenile's parent or custodian** who has been fully informed regarding the juvenile's right to a prompt detention hearing, the juvenile's right to counsel, including appointed counsel if the juvenile cannot afford counsel, and the juvenile's privilege against self-incrimination.

W. Va.Code § 49–5–2(1) (emphasis added). West Virginia Code § 49–1–5(5) (1996) defines "custodian" as "a person who has or shares actual physical possession or care and custody of a child, regardless of whether such person has been granted custody of the child by any contract, agreement or legal proceedings[.]" *Id.* In *Sugg*, we explained that "[i]t is implicit that a child involved in the commission of an offense should be afforded protective counseling concerning his legal rights from one interested in his welfare." 193 W.Va. at 400, 456 S.E.2d at 481[12]. The presence and consent of a parent or

---

11. Steven's natural mother testified that Ms Jenkins physically and sexually abused Steven and that Steven feared Ms. Jenkins. Ms. Jenkins allegedly attempted to place her finger in Steven's rectum on at least one occasion; when Steven refused, Ms. Jenkins allegedly kicked Steven out the window. On the day of the murder, Ms. Jenkins had allegedly given Steven's sister a

"birthday gift" for her sixteenth birthday consisting of sixteen stabs to the leg with a pin and sixteen stabs with a fork.

12. This issue of possible conflict of interest between the juvenile and the adult present with him during questioning also existed in *State v. George Anthony W.*, 200 W.Va. 86, 488 S.E.2d

guardian, as required by statute, may be rendered meaningless where the parent or guardian has a conflict of interest with the child or has no real parental relationship with the child, as was the case here where the biological mother had not seen the child in four years. As the United States District Court of Appeals for the District of Columbia Circuit reasoned in *McBride v. Jacobs*, 247 F.2d 595 (D.C.Cir.1957), "[w]here the court finds for any reason the minor is not capable of a waiver the parent may so waive provided the court also finds there is no conflict of interest between them, and of course the waiver by the parent must be an intelligent, knowing act." *Id.* at 596.

Rule 6(c) of the Arizona Rules of Procedure for the Juvenile Court provides guidance to the juvenile court, as follows:

> A child may waive counsel if the court finds that his waiver is knowingly, intelligently and voluntarily given in view of his age, education, apparent maturity and within the presence of his parents, guardian or custodian, at the time of waiver. The waiver of counsel should also be obtained from parents, guardian or custodian in attendance on behalf of the child and themselves. Waiver of counsel shall be set out in writing or in the minutes of the court. **If there is a conflict of interest between the child and his parents, guardian or custodian, the court shall impose such safeguards on waiver of counsel as appear in the best interests of the child.**

*Id.* (Emphasis supplied).

In *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the United States Supreme Court discussed the necessity of adult protection of juvenile rights, and explained as follows:

> [A] 14–year–old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him.... That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the

questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.

*Id.* at 54, 82 S.Ct. at 1212. The Court also emphasized that the child "would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights...." *Id.*

In a compelling dissent penned by Justice Marshall, joined by Justice Brennan, in *Little v. Arkansas*, 435 U.S. 957, 98 S.Ct. 1590, 55 L.Ed.2d 809 (1978), the issue of conflict of parental interest was addressed. Justice Marshall expressed the view that the Court should have granted "certiorari to resolve the question whether, before a juvenile waives her constitutional rights to remain silent and consult with an attorney, she is entitled to competent advice from an adult who does not have significant conflicts of interest." *Id.*, 435 U.S. 957, 98 S.Ct. 1590. The child, confessing to the murder of her father, had spent ten to fifteen minutes alone with her mother, who also believed herself to be a suspect in the murder investigation, prior to the confession. *Id.* Citing abundant authority for the proposition that a juvenile is entitled to consult with a parent or guardian, Justice Marshall observed that a parent or guardian may not always be in a position to provide the type of guidance contemplated by the requirement for parent or guardian consultation. In *Little*, for instance, the mother "was plainly not in a position to provide rational advice with only the child's interests in mind, especially on the day of the murder." *Id.* at 959, 98 S.Ct. at 1592. Referencing the Supreme Court's recognition in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), that competence of parents is a relevant factor in the determination of the validity of a waiver of rights by the child, Justice Marshall stated as follows:

> And to uphold a child's waiver on the ground that she received parental advice is surely questionable when the parent has

---

361 (1996). In that case, the juvenile being questioned was accompanied by his mother and aunt, both of whom had been suspects in the crime. Although the Court acknowledged that

the mother and aunt had been suspects, the precise issue of potential conflict of interest was not addressed. *Id.* at 87, 488 S.E.2d at 362.

two obvious conflicts of interest, one arising from the possibility that the parent herself is a suspect, and the other from the fact that she is "advising" the person accused of killing her spouse.

*Little,* 435 U.S. at 960, 98 S.Ct. at 1592.

In the present case, although Steven's biological mother was present during his murder confession,[13] she had no legal custody and had not visited Steven for approximately four years prior to the murder. Subsequent to Ms. Milburn's arrest for Ms. Jenkins' murder, Steven saw his biological mother only on the morning of the interview, when she drove him to the police station. Although Ms. Whetzel possessed a document purporting to grant her custody of Steven, her potentially adverse interests cannot be ignored. Steven contends that Ms. Whetzel pressured him into confessing to the murder in order to protect Ms. Milburn, the woman with whom Ms. Whetzel allegedly maintained an intimate relationship. This juvenile was taken into custody while his adoptive mother/legal guardian, Ms. Milburn, was incarcerated. Three different individuals arguably constituted the "parent or custodian" referenced in the statute. *See* W. Va.Code § 49–5–2(1). Yet, under the circumstances here, it would be difficult to conclude that any of them had both the ability and the motivation to give this juvenile the adult interest in and protection of his legal rights and his personal well-being envisioned by the statutory requirement for parental or custodial presence. In-

deed, the interests of Ms. Milburn and her alleged companion, Ms. Whetzel, were actually adverse to Steven's interests.

■ It would be unrealistic and overburdensome to place upon law enforcement authorities the task of making inquiry into the nature of parent-child relationships. However, where law enforcement authorities seeking to interrogate a juvenile have knowledge regarding a potential conflict of interest between parent (or custodian) and child with respect to the matters which are the subject of the interrogation, such law enforcement authorities must make further inquiry regarding the appropriate person to be present with the juvenile pursuant to West Virginia Code § 49–5–2(1).[14]

Based upon the foregoing, we conclude that the murder confession was obtained as a result of the delay in presentment to a magistrate and that the delay was for the primary purpose of obtaining a confession. We therefore reverse the decision of the lower court and remand this matter for further proceedings consistent with this opinion.

Reversed and remanded.

---

13. As we discussed above, when Steven first told Trooper Centano that he had murdered Ms. Jenkins, the trooper and Steven were alone in the room due to Steven's request that he speak privately with Trooper Centano. As Steven began to disclose that he had a personal role in the shooting, Trooper Centano summoned both Ms. Whetzel and the biological mother back into the

room and Steven thereafter confessed to the murder.

14. Trooper Centano relied upon the document purporting to grant custody to Ms. Whetzel, and the record does not reflect exactly what knowledge Trooper Centano had concerning the potentially adverse interests of Ms. Whetzel.