No. 118,211

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of P.W.G.,
A Minor Child.

SYLLABUS BY THE COURT

1.

In reviewing a district court's ruling on a motion to suppress, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts is reviewed de novo.

2.

The Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights guarantee the right against self-incrimination, including the right to remain silent and the right to have an attorney present during a custodial interrogation.

3.

A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. An investigatory interrogation occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage.

4.

Factors that a court may consider in analyzing whether the interrogation was custodial in nature include: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical

1

restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation.

5.

In juvenile cases where a child's age was known or objectively apparent to a reasonable officer at the time of questioning, the age of the suspect is also a factor.

6.

K.S.A. 2017 Supp. 38-2333(a) precludes introduction into evidence of statements made by a juvenile under the age of 14 years unless the statements were made following a consultation between the juvenile's parent or attorney as to whether the juvenile will waive the right to an attorney and the right against self-incrimination.

7.

If the State complies with the requirements set forth in K.S.A. 2017 Supp. 38-2333, that compliance is a factor to consider as part of the totality of the circumstances to determine whether the child made an intelligent and knowing waiver of the right to remain silent and the right to have an attorney present during a custodial interrogation. But if the State fails to comply with the requirements set forth in K.S.A. 2017 Supp. 38-2333, even the totality of the circumstances test is not sufficient to ensure the waiver was intelligently and knowingly made.

Appeal from Butler District Court; KRISTIN H. HUTCHISON, judge. Opinion filed July 20, 2018. Affirmed.

*Amanda J.M. Faber*, assistant county attorney, for appellant.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellee.

Before STANDRIDGE, P.J., HILL and BUSER, JJ.

STANDRIDGE, J.:  The State brings this interlocutory appeal following the district court's decision to grant P.W.G.'s motion to suppress. After P.W.G., a juvenile, waived his *Miranda* rights and made inculpatory statements during a police interrogation, he was charged with two counts of aggravated indecent liberties with a child. Before trial, P.W.G. moved to suppress those statements. The district court granted the motion, finding that P.W.G.'s police interrogation was custodial and that his *Miranda* waiver was invalid under K.S.A. 2017 Supp. 38-2333(b), which governs the admissibility of confessions from a juvenile who is less than 14 years of age. For the reasons stated below, we affirm the district court's decision to suppress the statements made by P.W.G. during the police interrogation.

## FACTS

On November 15, 2016, Audrey K. reported to the El Dorado Police Department that she had reason to believe her 6-year-old son, E.G., had been fondled by his 13-year-old half-brother, P.W.G., while the two boys had weekend visits with their shared biological father, Pablo G. On November 16, 2016, Sergeant Jeff Murphy interviewed E.G. During this interview, E.G. alleged that he and P.W.G. had touched each other's penises approximately seven or eight times and that P.W.G. had anally penetrated him.

That same day, Sergeant Murphy contacted Pablo and asked him to bring P.W.G. to the police station for an interview. According to Murphy, he provided "minimal" information to Pablo, explaining that there was an active investigation involving E.G. as the victim of sexual abuse and P.W.G. as the alleged perpetrator of the abuse. Pablo brought P.W.G. to the police station that afternoon for the interview. Pablo later testified

3

that when they arrived for the interview, he knew that the allegations involved P.W.G. but was unsure as to whether P.W.G. was the alleged victim or the alleged perpetrator.

A video recording of the interview shows Sergeant Murphy leading P.W.G. and Pablo into a room and Murphy closing the door behind them. After the three sat down, Murphy explained that he wanted to talk to P.W.G. about some serious things E.G. said happened on visitation weekends at their father's house. Murphy further explained that because of P.W.G.'s age, the interview had to be conducted with a parent present. Murphy advised P.W.G. that he could be considered a suspect in the case because of the nature of the offenses. At this point, Pablo asked Murphy whether the request to interview P.W.G. was related to Audrey's request to have full custody of their children, which the family court previously had denied. Murphy said no; the interview had to do with allegations made by E.G. against P.W.G., which Murphy went on to say he had no doubt were true. Citing to his extensive experience in "these cases," Murphy said the issue was not "if" the offenses alleged by E.G. happened, but "why" they happened. Murphy then advised that the worst thing P.W.G. could do in a situation like this one was to deny something happened when P.W.G. knew it really had happened. Murphy emphasized that he was very good at his job and would not bring a child to the police station with a parent and confront the child with allegations of wrongdoing if Murphy did not believe the allegations were true.

At this point, Sergeant Murphy asked Pablo if he would give Murphy permission to speak with P.W.G., noting that Pablo was more than welcome to either stay for the interview or leave. Pablo told Sergeant Murphy that he would stay because he was anxious to learn the details of the unspecified allegations his son E.G. had made against his other son P.W.G. Murphy said he would provide the details of the allegations if, after being advised of his right to remain silent and to have counsel present during the interview, P.W.G. agreed to answer questions. Murphy went on to say that "[i]f we get that knocked out, and you guys are willing to speak with me, then I will put all the details

4

on the table." Taking out a document entitled *Miranda* Warning, Murphy then read and explained to P.W.G. each of the rights set forth in it. After having P.W.G. acknowledge by initials that Murphy read each of the rights to him, Murphy and Pablo signed as witnesses. Murphy then told P.W.G. that "[i]f you and your dad want to read this and you understand it, then sign and date right there and then I'll sign down there. . . . You might have your dad read that with you. If you guys have questions, ask." The "it" to which Murphy referred was the waiver of rights section of the *Miranda* Warning form. Murphy did not verbally refer to the section as a waiver of rights, let alone explain what it meant to waive the rights Murphy had just enumerated. After P.W.G. and Pablo silently read and then signed the waiver, Murphy formally asked Pablo for permission to speak to P.W.G. Pablo responded that he was fine with it because he wanted to know what was going on. When asked, P.W.G. told Murphy that he was willing to answer Murphy's questions.

At the outset of the interview, Sergeant Murphy stated that he was not trying to get P.W.G. in trouble, but serious issues needed to be addressed in order to help P.W.G. Upon questioning from Murphy, P.W.G. confirmed that he visited Pablo's house every other weekend and that he and E.G. shared a bedroom there. Murphy then advised P.W.G. of E.G.'s claims of inappropriate touching between the two brothers. After a period of silence, Murphy told P.W.G. to just be honest. When P.W.G. still did not respond, Murphy repeated the statements he made before advising P.W.G. of his right to remain silent and his right to have an attorney present: Murphy had no reason to think E.G. was being dishonest, Murphy would not bring someone in with a parent unless he believed something had happened, and that being dishonest was the worst thing P.W.G. could do.

P.W.G. admitted that he and E.G. sometimes slept in the same bed together and that he helped bathe E.G. but denied that any inappropriate touching had occurred in the bedroom or bathroom. P.W.G. said he did not know why E.G. would make such claims.

5

Sergeant Murphy explained that if P.W.G. did inappropriately touch E.G., it would not necessarily mean that P.W.G. understood that what he was doing was wrong. Murphy stressed that if inappropriate touching had occurred, P.W.G. should talk to Murphy about it now because it could be an impulse problem that P.W.G. could not control. Murphy generally commented that nobody was accusing P.W.G. of hurting anyone and then specifically commented that no one was accusing P.W.G. of hurting E.G. When P.W.G. did not respond to Murphy's comment, Murphy asked whether P.W.G. was not talking about the inappropriate touching because P.W.G. was afraid. After P.W.G. said no, Pablo interjected, instructing P.W.G. to just tell the truth. Pablo went on to say that if P.W.G. did something wrong, both Murphy and Pablo wanted to know. Pablo again instructed P.W.G. to tell the truth.

Sergeant Murphy then picked up where Pablo left off, explaining that it is important to tell the truth not just because it would help P.W.G. but also because it would help E.G. Specifically, Murphy said, "This could affect [E.G.] too as far as [E.G.] being able to come to dad's house to visit." Murphy said that E.G.'s allegations were not something he just made up that day. Murphy went on to reiterate that no one was mad at P.W.G. about the situation. In support of this notion, Murphy explained that P.W.G. and E.G. had different moms, so what happened in the relationship between Pablo and E.G.'s mom would not affect what happened in the relationship between Pablo and P.W.G.'s mom. Murphy commented that E.G. wanted to be able to be around their dad, too.

At that point, which was about 28 minutes into the interrogation, P.W.G. disclosed that E.G. had tried to touch him while they were in bed together, but he told E.G. to stop. P.W.G. continued to deny that he had inappropriately touched E.G. Apparently not believing P.W.G., Sergeant Murphy urged P.W.G. to disclose the truth, just like his dad was telling him. Murphy told P.W.G. that E.G. was not lying because E.G. had no reason to lie. Murphy noted that E.G. was in a bad situation because E.G. did not know when he was going to get to see his dad again. At about 37 minutes into the interrogation, P.W.G.

6

admitted that he had asked E.G. to touch his penis in the bathtub because he wondered how it felt. P.W.G. claimed that he told E.G. to stop right after because he knew it was not right. P.W.G. denied trying to anally penetrate E.G. After P.W.G.'s admission, Murphy left the room for a few minutes. During this time, Pablo told P.W.G. that he had to tell the truth because Pablo was not going to be able to see E.G. until the issue was resolved. Pablo said he felt bad about the situation because P.W.G. and E.G. were both his kids and that he wanted to help both of them. Pablo then reiterated that P.W.G. should be honest because, again, he wanted to help P.W.G. and E.G. because they were both his sons.

After Sergeant Murphy reentered the room, Pablo continued talking to P.W.G., saying he wanted to know what was going on because E.G. was his son and P.W.G. was his son. Pablo went on to say that everyone makes mistakes and P.W.G. should "be a man" and be honest with Murphy, if he had not been honest so far, so they could get to the bottom of what had happened.

Sergeant Murphy again expressed his belief that E.G. was telling the truth and that P.W.G. was minimizing his involvement. After Pablo encouraged P.W.G. to tell them what happened, P.W.G. admitted that he and E.G. had touched each other's penises "once or twice" in the bedroom and bathroom. P.W.G. also admitted that he had told E.G. not to tell anyone because they could get in trouble. P.W.G. again denied trying to anally penetrate E.G. Murphy then spoke about the seriousness of P.W.G.'s actions, stating that P.W.G. was old enough to be charged with a crime and that the county attorney would ultimately make that decision. Murphy explained that the crime of aggravated indecent liberties with a child is a felony sex crime that, if committed by an adult, could result in a significant prison sentence and placement on a sex offender registry. Murphy stated that he did not think that P.W.G. was telling the full story and that he hoped P.W.G. would talk to Pablo about what had happened. Murphy ended the interview with P.W.G. after approximately one hour and six minutes. After the interview ended, Murphy spoke to

7

Pablo alone for almost 15 minutes. Pablo expressed his shock and concern for his two sons and stated that he was willing to do whatever he could to help both P.W.G. and E.G. Murphy advised that it would be best if P.W.G. was not around kids for a while and that the county attorney would decide what happened next.

At some point after Sergeant Murphy interviewed P.W.G., Murphy interviewed Pablo. According to Murphy, the purpose of the interview was to follow up on Pablo's involvement in the case. Murphy clarified that Pablo was involved in the case to the extent that Pablo was the father of both the alleged victim and the alleged perpetrator.

The State ultimately charged P.W.G. with two counts of aggravated indecent liberties with a child. P.W.G. moved to suppress the statements he made during the interrogation, claiming that his *Miranda* waiver was invalid under K.S.A. 2017 Supp. 38-2333, which sets forth certain criteria relating to the admissibility of juvenile custodial confessions. In response, the State argued that K.S.A. 2017 Supp. 38-2333 was inapplicable because P.W.G.'s interrogation was not custodial and even if it was custodial, Sergeant Murphy fully complied with the statute by making sure a parent was present when P.W.G. waived his *Miranda* rights. Following a hearing, the district court granted P.W.G.'s motion to suppress. The State timely filed this interlocutory appeal.

STANDARD OF REVIEW

A dual standard is used when reviewing a decision ruling on a motion to suppress a confession. In reviewing a district court's ruling, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015).

8

The district court held that P.W.G.'s waiver of his right against self-incrimination and his right to counsel were invalid under K.S.A. 2017 Supp. 38-2333(b), which in turn required the court to suppress all statements made by P.W.G. to Sergeant Murphy at the police station. On appeal, the State asserts two points of error in the court's holding. First, the State argues the district court erred by finding that P.W.G. was in custody at the time of the interrogation and, therefore, the State was not required to secure a waiver of rights from P.W.G. Second, the State argues that even if P.W.G. was in custody, the district court erred by finding that P.W.G.'s waiver of rights was invalid under K.S.A. 2017 Supp. 38-2333(b). We address each of the State's arguments in turn.

*Custodial interrogation*

The Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights guarantee the right against self-incrimination, including the right to remain silent and the right to have a lawyer present during a custodial interrogation *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State v. Aguirre*, 301 Kan. 950, 954, 349 P.3d 1245 (2015). The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation.

The State argues it was not required to secure a waiver of rights from P.W.G. because P.W.G. was not in custody at the time of the interrogation. A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way. This type of interrogation is distinguished from an investigatory interrogation, which occurs as a routine part of the fact-finding process before the investigation reaches the accusatory stage. *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d

9

1111 (2012) (establishing factors for determining whether interrogation is investigatory or custodial). The State bears the burden to prove by a preponderance of the evidence that the suspect was not in custody when interrogated. See *State v. Lewis*, 299 Kan. 828, 836, 326 P.3d 387 (2014).

An objective, two-part inquiry is used to determine whether an interrogation was custodial. Different standards of review apply to each part of the inquiry. Under the first inquiry, we consider the circumstances surrounding the interrogation by reviewing the district court's factual findings to determine whether they are supported by substantial competent evidence. Under the second inquiry, we determine whether, considering the totality of the circumstances, a reasonable person would have felt free to terminate the interrogation and leave. This second inquiry is an objective one subject to de novo appellate review. *Warrior*, 294 Kan. at 497.

Factors that a court may consider in analyzing whether the interrogation was custodial in nature include: (1) the place and time of the interrogation; (2) the duration of the interrogation; (3) the number of police officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation. Importantly, each case must be examined on its own facts; the listed factors do not necessarily carry equal weight; and the importance of each factor will vary from case to case. *Lewis*, 299 Kan. at 835. In juvenile cases where a child's age was known or objectively apparent to a reasonable officer at the time of questioning, the age of the suspect is also a factor because "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go."

10

*J.D.B. v. North Carolina*, 564 U.S. 261, 272, 277, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011).

After reviewing these factors and considering the totality of the circumstances, the district court judge found that the interrogation was custodial:

> "Like I said, it occurred at the police department. It's hard to imagine that a 13-year-old would have felt comfortable in walking out of the room at any time. The length of the interview I don't think was, you know, overly long; however, the questioning did go for, I believe, at least 45 minutes before [P.W.G.] started giving answers that I think we're really confessional in nature. The fact that the officer gave the *Miranda* is also an indication of it being custodial.
> "Also in this case I believe the testimony from . . . Pablo . . . that neither [P.W.G.] nor his father . . . had any history of criminal contact. This was a new situation for both of them. The questioning itself definitely had a custodial feel to it. So those all are factors going into my decision that it is custodial in nature."

A review of the circumstances surrounding the interrogation reflects that P.W.G. was 13 years old at the time of the interrogation. There is no question that Sergeant Murphy was aware of P.W.G.'s age. Thus, in considering the totality of the circumstances, the legal question presented is not whether a reasonable person would have felt free to leave, but whether a reasonable 13-year-old would have felt free to terminate the interrogation and leave. See *J.D.B.*, 564 U.S. at 270-72, 277 (when child's age is known or reasonably apparent to police officer, it must be considered when determining how reasonable person in suspect's position would perceive his or her freedom to leave for *Miranda* purposes).

The interrogation occurred around 2:35 p.m. at the El Dorado Police Station. The fact that the interrogation took place at a police station generally points to it being custodial. See *Warrior*, 294 Kan. 484, Syl. ¶ 4. The State makes much of the fact that the

11

interrogation took place in a "soft" interview room that contained furniture and windows, claiming it was more neutral than a typical interview room because it was located in an unsecured area of the police station that is accessible to the general public. Although the room was arguably accessible to the public, Sergeant Murphy closed the door before the interrogation began, suggesting that it was not accessible to the public at that time. When Murphy left the room, he closed the door behind him, which also suggests P.W.G. was not permitted to leave. Although in his testimony he referred to it as a soft interview room, Murphy conceded that the room was regularly used to interrogate suspects and not just to interview witnesses for investigative purposes.

At Sergeant Murphy's direction, Pablo got P.W.G. out of school while it was in session and took P.W.G. to a police station to be interviewed by law enforcement, which suggests a more serious purpose than merely an investigative interview. The interrogation lasted a little over an hour. The duration of the interrogation is not necessarily determinative of whether it was custodial. Murphy was the only person who questioned P.W.G.

With respect to the conduct of the officer and the person subject to the interrogation, the State notes that Sergeant Murphy did not raise his voice; that Pablo was present with P.W.G. during the interrogation; and that there is no evidence that either Pablo or P.W.G. suffered from any mental, intellectual, or emotional problems that might have affected their perception of whether they could terminate the questioning. Although the State's observations are accurate, the record contains additional evidence of the officer's conduct that weighs in favor of a finding that the interrogation was custodial in nature. Murphy testified that even before he gave the *Miranda* warnings, he told P.W.G., "'I think there's some fondling that's taking place. The worst thing you can do is deny something when you know it has happened.'" He also told P.W.G., "'I don't bring someone down here with a parent unless I believe something's happened.'" Murphy went

12

on to say, "I think there's some things that have happened. . . . It's not a matter of . . . 'if' it happened, it's a matter of 'why.'"

Telling a suspect that the "worst thing you can do is deny something when you know it has happened" is contradictory to the *Miranda* warnings later given to P.W.G. See *State v. Pillar*, 359 N.J. Super. 249, 268, 820 A.2d 1 (App. Div. 2003) ("A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other."); see also *Hart v. Attorney General of State of Florida*, 323 F.3d 884, 894 (11th Cir. 2003) ("Telling [the defendant] that 'honesty wouldn't hurt him' contradicted the *Miranda* warning that anything he said could be used against him in court."); *Woods v. Clusen*, 794 F.2d 293, 297 (7th Cir. 1986) ("[S]tatement to the juvenile that it would 'be better' if Woods talked was dubious advice to the ignorant, as any minimally competent defense counsel would be quick to attest."); *Quick v. State*, 599 P.2d 712, 720 n.12 (Alaska 1979) (distinguishing "between mere exhortations to tell the truth and promises of leniency or better treatment").

In addition, when explaining P.W.G.'s rights to him on the *Miranda* warning form, Sergeant Murphy appeared to advise that P.W.G.'s right to have an attorney be present during questioning was actually vested in Pablo:

> "[Murphy (going over *Miranda* warning form)]: You have the right to talk with a lawyer. . . . What that means *is if your dad decides that you guys want to get an attorney or a lawyer, that's your guys' right*. Okay? All you guys got to do is tell me that and we're done. . . . That means you guys at any point can get an attorney. . . . *More so your parent* [*can get a lawyer*]." (Emphases added.)

As the district court pointed out, Sergeant Murphy refrained from asking P.W.G. any questions until after he advised P.W.G. of his *Miranda* rights. In fact, Murphy readily acknowledged at the suppression hearing that he considered P.W.G. to be a suspect, and not a witness, after interviewing E.G. Murphy was not merely questioning P.W.G. as a

suspect, he was directly accusing P.W.G. of the serious allegations made by E.G., allegations that Murphy repeatedly told P.W.G. he believed were all true. The accusatory nature of the questioning weighs heavily in favor of a finding that the interrogation was custodial.

P.W.G. was never restrained, and it does not appear from the video that Sergeant Murphy was armed during the interrogation. Although P.W.G. was not escorted by law enforcement to the interrogation and he was not arrested or detained afterwards, P.W.G. did not arrive at the police station under his own free will—he was picked up at school and transported to the police station by his father at the direction of Murphy. See *In re S.R.*, No. 116,245, 2017 WL 1300092, at *4 (Kan. App.) (unpublished opinion) ("It is difficult for us to envision S.R. refusing to speak with the detective once he was brought there by his parents."), *rev. denied* 306 Kan. 1318 (2017).

Although a close case, the totality of the circumstances surrounding the interrogation of P.W.G. in this case persuade us that a reasonable 13-year-old child would not have felt free to terminate the interrogation and leave. See *Warrior*, 294 Kan. at 497; see also *Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 92 L. Ed. 224 (1948) (in context of police interrogation, events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens"). In finding the interrogation was custodial and not investigative, we rely on the fact that P.W.G. was only 13 years old at the time of the interrogation; the interrogation took place in a police station; P.W.G. was being questioned as a suspect at all times before, during, and after the interrogation; P.W.G. did not arrive at the police station under his own free will—he was picked up at school while school was still in session and transported to the police station by his father at the direction of Sergeant Murphy; Murphy told P.W.G. both before and after advising P.W.G. of his rights that he (Murphy) did not bring someone to the police station with a parent unless he believed something had happened; that the worst thing P.W.G. could do was deny something when P.W.G. knew it had happened; and that it was not a matter of

14

"if" the unlawful acts happened, but a matter of "why" they happened. In considering the nine factors (the ninth being that P.W.G. was a child) relevant to whether an interrogation is custodial or investigatory in nature, we are mindful of our Supreme Court's admonition that no single factor outweighs another and the factors do not bear equal weight; instead, every case must be analyzed on its own particular facts. *Lewis*, 299 Kan. at 835.

For the reasons stated above, we affirm the district court's finding that the interrogation was custodial.

*Voluntariness of* Miranda *waiver*

Even if P.W.G.'s interrogation was custodial, the State argues that his statements are still admissible because P.W.G. made those statements after voluntarily and knowingly waiving his *Miranda* rights under the strict requirements set forth in K.S.A. 2017 Supp. 38-2333.

K.S.A. 2017 Supp. 38-2333 provides:

> "(a) When the juvenile is less than 14 years of age, no admission or confession resulting from interrogation while in custody or under arrest may be admitted into evidence unless the confession or admission was made following a consultation between the juvenile's parent or attorney as to whether the juvenile will waive the right to an attorney and the right against self-incrimination. It shall be the duty of the facility where the juvenile has been delivered to make a reasonable effort to contact the parent immediately upon the juvenile's arrival unless the parent is the alleged victim or alleged codefendant of the crime under investigation.
> "(b) When a parent is the alleged victim or alleged codefendant of the crime under investigation and the juvenile is less than 14 years of age, no admission or confession may be admitted into evidence unless the confession or admission resulting from interrogation while in custody or under arrest was made following a consultation between the juvenile and an attorney, or a parent who is not involved in the investigation

of the crime, as to whether the juvenile will waive the right to an attorney and the right against self-incrimination. It shall be the duty of the facility where the juvenile has been delivered to make reasonable effort to contact a parent who is not involved in the investigation of the crime immediately upon such juvenile's arrival."

The court held Pablo's presence at the time of waiver and during the interrogation did not comply with the requirements set forth in K.S.A. 2017 Supp. 38-2333(b) because Pablo was the father of both the suspect and the alleged victim. Specifically, the court considered Pablo to be a victim under K.S.A. 2017 Supp. 38-2333(b) because "as the alleged victim's father[,] he could be tasked with providing victim impact statements on behalf of the six year old alleged victim, or to address the Court on the alleged victim's behalf at a Sentencing hearing." The court ultimately held the waiver was invalid because Pablo's irreconcilable conflict of interest prevented P.W.G. from having an impartial parent to consult with P.W.G. about waiving his *Miranda* rights as required by statute.

In challenging the district court's ruling, the State claims that Pablo does not meet the definition of a "victim" of the crime under investigation as that term is used in the statute. Specifically, the State notes that the Victims' Bill of Rights, K.S.A. 74-7333 et seq., defines the terms "victim" and "victim's family" separately and suggests that Pablo could not be a victim in this case because he did not suffer direct harm from the alleged crime. The State contends that the district court's ruling would improperly force Pablo to abdicate his role as a parent for one or both of his children. We agree with the State to the extent that it contends Pablo likely did not qualify as a victim of the crime being investigated by Sergeant Murphy. We do not agree with the State, however, that P.W.G. voluntarily and knowingly waived his *Miranda* rights under the requirements set forth in K.S.A. 2017 Supp. 38-2333.

In *In re B.M.B.*, 264 Kan. 417, Syl. ¶ 2, 955 P.2d 1302 (1998), our Supreme Court adopted a bright-line rule requiring inculpatory statements taken from children less than

16

14 years old to be suppressed unless they had been given the opportunity to consult with a parent, and both the parent and child are given warnings concerning the right to remain silent.

> "We hold, therefore, that a juvenile under 14 years of age must be given an opportunity to consult with his or her parent, guardian, or attorney as to whether he or she will waive his or her rights to an attorney and against self-incrimination. Both the parent and juvenile shall be advised of the juvenile's right to an attorney and to remain silent. Absent such warning and consultation, a statement or confession cannot be used against the juvenile at a subsequent hearing or trial." 264 Kan. at 432-33.

In support of its holding, the *In re B.M.B.* court stated:

> "We cannot ignore the immaturity and inexperience of a child under 14 years of age and the obvious disadvantage such a child has in confronting a custodial police interrogation. In such a case, we conclude that the totality of the circumstances is not sufficient to ensure that the child makes an intelligent and knowing waiver of his rights." 264 Kan. at 432.

This holding in *In re B.M.B.* was later codified in K.S.A. 2017 Supp. 38-2333, and the totality of the circumstances rule remains intact for purposes of determining whether a child under 14 years of age makes an intelligent and knowing waiver of his or her *Miranda* rights. Accordingly, if the State complies with the requirements set forth in K.S.A. 2017 Supp. 38-2333, that compliance is a factor to consider as part of the totality of the circumstances to determine whether the child made an intelligent and knowing waiver of the right to remain silent and the right to have an attorney present during a custodial interrogation. But if the State fails to comply with the requirements set forth in K.S.A. 2017 Supp. 38-2333, even the totality of the circumstances test is not sufficient to ensure the waiver was intelligently and knowingly made.

17

In this case, P.W.G. was less than 14 years old at the time of the custodial interrogation; thus, K.S.A. 2017 Supp. 38-2333 is applicable here. As noted above, there is nothing in the record to support a finding that Pablo was an alleged victim or alleged codefendant of the crime under investigation; thus, subsection (b) of the statute is inapplicable to the facts here. That leaves us with subsection (a), which precludes introduction into evidence of statements made by a juvenile under the age of 14 years unless the statements were "made following a consultation between the juvenile's parent or attorney as to whether the juvenile will waive the right to an attorney and the right against self-incrimination." K.S.A. 2017 Supp. 38-2333(a). The State claims Sergeant Murphy complied with the statute because P.W.G.'s parent, Pablo, was present when P.W.G. acknowledged that he understood his right to remain silent, to have an attorney present, and his right against self-incrimination but was willing to waive those rights and make a statement and answer questions.

Although the State is correct that Pablo was present while Sergeant Murphy explained P.W.G.'s rights and when P.W.G. acknowledged that he understood those rights, the statute requires more than mere presence of a parent. Specifically, the statute requires a consultation with the parent as to whether the juvenile will waive the rights at issue. Here, there was no consultation. In fact, Murphy concedes he did not even give Pablo and P.W.G. enough time to engage in such a consultation. When asked about it at the hearing, Murphy testified,

> "I don't think I honestly gave them enough time to move forward with that. I think I read the *Miranda* [rights] to [P.W.G.], and I believe I made sure that Pablo was still okay for me to speak with his son, and I began the interview. As far as taking a timeout and let them discuss anything, no, I didn't."

Notably, our review of the video recording confirms that Sergeant Murphy did not provide any time for Pablo to consult, provide an explanation, or give guidance to P.W.G.

18

After going over P.W.G.'s rights with him, Murphy immediately told P.W.G. to read the information at the bottom of the page and, if he understood and agreed, to sign it. Significantly, the information at the bottom of the page was the waiver of rights, stating that P.W.G. understood each of his rights but was willing to waive those rights to make a statement and answer any questions without an attorney present. After P.W.G. started reading what Murphy referred to as the information at the bottom of the page, Murphy told Pablo that he should probably read it, too. At no time did Murphy verbally refer to the waiver of rights, let alone explain what it meant. And again, Murphy concedes he did not give Pablo and P.W.G. any time to talk about whether P.W.G. should waive the right to an attorney and the right against self-incrimination. Based on these facts, it appears the State failed to comply with the requirements set forth in K.S.A. 2017 Supp. 38-2333(a), which means that even the totality of the circumstances test is not sufficient to ensure that P.W.G. made an intelligent and knowing waiver of his *Miranda* rights.

But even if Sergeant Murphy had given P.W.G. and Pablo time to talk, any waiver by P.W.G. of his *Miranda* rights would have been invalid given Murphy knew from the outset that Pablo—as parent to both the alleged victim and the alleged perpetrator in this case—had an irreconcilable conflict of interest. Pablo's known conflict of interest necessarily would have exempted Pablo as an objective nonbiased parent with whom P.W.G. could consult to determine whether he should waive the right to an attorney and the right against self-incrimination as required by K.S.A. 2017 Supp. 38-2333(a).

Sergeant Murphy testified that he knew from the outset that Pablo was the father of both E.G. and P.W.G and that the boys had different mothers. Notwithstanding the conflict of interest created by asking the father of both the suspect and the victim to act in the best interests of just the suspect, Murphy testified he was comfortable calling in Pablo to be the parent with whom P.W.G. would consult about waiving *Miranda* rights under K.S.A. 2017 Supp. 38-2333(a), notwithstanding the fact that Murphy had the name and phone number for P.W.G.'s mother, a parent who had no conflict of interest:

19

"[b]ecause [Pablo was] the father of [P.W.G.] And in my opinion him being the father—I don't know the dynamics of all families, all I know is that Pablo has a legal right to [P.W.G.], he can make decisions for [P.W.G.], and with the information that I'd received prior to advancing to that decision, I felt there was nothing that would hinder . . . Pablo from making decisions for [P.W.G.]."

The last sentence in Sergeant Murphy's explanation—that there was nothing to hinder Pablo from making decisions for P.W.G.—defies logic given Pablo was the father of both the accused and the victim. The mere presence of a parent is insufficient to protect a juvenile's rights; the parent must be acting with the interests of the juvenile in mind. That is not to say that a parent cannot advise his or her child to cooperate with the police or even to confess to a crime if the parent believes that the child in fact committed the criminal act. Even if Murphy would have provided any time for Pablo to consult, provide an explanation, or give guidance to P.W.G. regarding whether to waive *Miranda* rights, Pablo's irreconcilable conflict would have precluded him from acting solely in P.W.G.'s best interests in consulting, explaining, or guiding P.W.G.'s decision. Pablo's comments to P.W.G. during the interrogation bear out this conflict:

"[Pablo]: Just say what it is, [P.W.G.] . . . Tell him straight. Whatever happened, accept it. . . . This is the time. I made mistakes in my life. . . . and you just need to say it because that is the only way you learn. . . . If you think you made a mistake, if you think you did something wrong, he wants to know, I want to know. . . . I love you. . . . I want you to get help. I don't know what happened. . . . I am in shock with this. *I am here to help you.* . . .

"[Murphy]: *It's important for you . . . also important for* [*E.G.*]*, too.* [*E.G.*] *doesn't understand exactly what's going on.* . . . I'm just trying to assess things and figure out where we're at. Do I need to have concerns about you? . . . *This could affect* [*E.G.*] *too as far as* [*E.G.*] *being able to come to dad's house to visit.*. . . Your relationship and custody issue with your dad . . . you have a separate mom than [E.G.] So see, that's the difference there. What happens with [E.G.] and his mom and your dad doesn't even affect

20

you and your dad's relationship or your mom and your dad's relationship. . . . And [E.G.] will want to be around your dad all the time, too.

.  .  .  .

"[Pablo]:  I want to help you and I want to help [E.G.] Okay? Your both kids. I was your age before. Okay? . . . I made mistakes in my life [P.W.G.] I have learned it the hard way. . . . All I am telling you [P.W.G.] is if you made a mistake, . . . of course, it was not right. I mean, I feel really bad about the situation because you both are my kids. Both of you. And I didn't know any of this. So to me if you say, dad, . . . this is what is going on, I'm not going to jump on you. I'm not going to be mad at you or even be mad at [E.G.]; I will try to find how can I help you guys. . . . So what I'm telling you . . . all I'm asking you [P.W.G.], be honest about the situation. I want to help you, and I want to help [E.G.] You both are my sons." (Emphases added.)

Pablo's statements to Murphy after P.W.G. left the room further demonstrate the irreconcilable conflict:

"[Pablo]:  Both are my kids. I want to protect both of them. I want them to grow up being brothers. . . . We got to see what this is about. I don't want to make Audrey feel like I'm fighting against her trying to protect him."

Although the statute does not govern the unique facts presented in this case, K.S.A. 2017 Supp. 38-2333(b) recognizes that there are situations where consultation with a parent regarding the waiver of a juvenile's rights is not sufficient, such as when a parent is an alleged victim or alleged codefendant of the crime under investigation. A parent in these situations would have an obvious conflict of interest with the juvenile's legal interests. Although not codified in the statute, such a conflict of interest may also exist in cases where, as here, the parent of the juvenile is also the parent of the alleged victim. In this case, Pablo repeatedly expressed concern for both of his sons on multiple occasions and continually urged P.W.G. to be honest and tell Sergeant Murphy the truth about what had happened. At the suppression hearing, Pablo testified that he only

21

encouraged P.W.G. to tell the truth because he wanted to fix the situation and needed to know the truth in order to help the brothers "figure this out."

Pablo's concern for finding out the truth about what had happened between his sons was at odds with P.W.G.'s statutory right to consult with a nonconflicted parent or attorney at the beginning of the interrogation in order to determine whether to heed the *Miranda* warning and remain silent. Therefore, even if Sergeant Murphy had complied with K.S.A. 2017 Supp. 38-2333 by giving P.W.G. time to consult with Pablo regarding the waiver of *Miranda* rights, any such consultation would have been insufficient under that statute. See *Matter of Steven William T.*, 201 W. Va. 654, 662-63, 499 S.E.2d 876 (1997) (parental consent may be rendered meaningless where parent has conflict of interest with child). The better practice in this case would have been for Murphy to contact P.W.G.'s mother, who is not related to E.G. See 201 W. Va. at 664 ("[W]here law enforcement authorities seeking to interrogate a juvenile have knowledge regarding a potential conflict of interest between parent [or custodian] and child with respect to the matters which are the subject of the interrogation, such law enforcement authorities must make further inquiry regarding the appropriate person to be present with the juvenile.").

CONCLUSION

Considering the totality of the circumstances as set forth above, we affirm the district court's finding that P.W.G. was in custody at the time of the interrogation and, albeit upon different grounds, affirm the district court's finding that P.W.G.'s waiver of his *Miranda* rights was invalid under K.S.A. 2017 Supp. 38-2333.

Affirmed.

BUSER, J., dissenting:  I dissent from the majority's holding which affirms the district court's order suppressing P.W.G.'s incriminating admissions. In particular, I disagree with the legal conclusion by the district court and my colleagues that Detective Jeff Murphy conducted a custodial interrogation. In my opinion, the detective's questioning of P.W.G. was an investigative interview for which a valid waiver of *Miranda* rights was not required. Moreover, because Detective Murphy did not conduct a custodial interrogation, I would find that K.S.A. 2017 Supp. 38-2333(a) and (b) are not applicable to the facts and circumstances of this case. Accordingly, those provisions do not preclude admission of P.W.G.'s incriminating statements in evidence.

## CUSTODIAL INTERROGATION

"A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way." *State v. Lewis*, 299 Kan. 828, 834, 326 P.3d 387 (2014). In this case, it is undisputed that P.W.G. was not under arrest or in custody at the time of the interview. The question then becomes was he deprived of his freedom in any significant way? I agree with my colleagues that to analyze this question an appellate court looks to the eight factors most recently reprised in *Lewis*, 299 Kan. at 835.

In applying these eight factors to the circumstances of this case, I will analyze whether the district court's factual findings are supported by substantial competent evidence, and whether the district court's legal conclusion was correct—that a reasonable person would not have felt free to terminate the interrogation and leave. See *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012).

1. *The place and time of the interrogation.*

With regard to this first factor, the district court simply found the "interrogation occurred at the police station." The district court considered this factor as indicative of a custodial interrogation. No finding was made as to the time of the interview, although it was uncontroverted that it occurred about 2:35 p.m. at the El Dorado Police Station.

The majority downplays the testimony that the interview was conducted in the "soft interview room." But the undisputed testimony was that the room was in an unsecured area of the police department, next to the municipal court clerk's office, and accessible to the public. This was a multi-purpose room used by law enforcement, in addition to victims, witnesses, and attorneys practicing in city court.

The room itself was described as having a window on one wall, a bookshelf on another, and a door with a window that allowed any occupant to see out into the public hallway. The room contained furniture, a drawing board, table, and several chairs. In fact, Detective Murphy's testimony was that he specifically chose the soft interview room because of P.W.G.'s young age and it had more room to accommodate P.W.G.'s father.

While my colleagues cite *Warrior*, 294 Kan. 484, Syl. ¶ 4, for the proposition that an interview at a police station "generally points to it being custodial," slip op. at 12, in fact, *Warrior* teaches the converse: "Generally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere and this factor weights against a conclusion that an interview was custodial." 294 Kan. 484, Syl. ¶ 4. Kansas caselaw is replete with cases wherein an interview at a police station was found to be noncustodial. See *State v. Morton*, 286 Kan. 632, 647, 186 P.3d 785 (2008) (listing cases).

24

I believe the circumstances surrounding the soft interview room and the mid-afternoon time of the interview favor a finding that the interview was noncustodial.

2. *The duration of the interrogation.*

The district court found the one-hour length of the interview was "not overly long, but it's certainly not short." Although it is undisputed that the interview lasted about an hour, there is disagreement regarding when, during the interview, P.W.G. made incriminating statements about the sexual touching between him and his six-year-old half-brother, E.G. According to the district court, P.W.G. gave incriminating answers about 45 minutes into the interview. On appeal, P.W.G. adopts the district court's estimate. For its part, the majority states that 28 minutes into the interview "P.W.G. disclosed that E.G. had tried to touch him while they were in bed together, but he told E.G to stop. . . . At about 37 minutes into the interrogation, P.W.G. admitted that he had asked E.G. to touch his penis in the bathtub because he wondered how it felt." Slip op. at 6-7. Substantial competent evidence does not support the time estimates of P.W.G.'s admissions as determined by the district court.

Based on my review of the times memorialized on the video recording, corroborated by independent timing, P.W.G. first admitted to the sexual touching in the bedroom and bathtub about 28 minutes after the interview began. About 34 minutes into the interview, P.W.G. said that he participated in the mutual touching because he was just "wondering" about it; and about 37 minutes into the interview, P.W.G. told Detective Murphy that the younger brother's touching of his penis "felt weird" and it "got hard." Also at this time, P.W.G. said he told his younger brother to "stop doing it" because he "didn't think it was right." Later in the interview, P.W.G. added additional details. In summary, based on the confirmed times shown on the video recording, the substantial competent evidence proves:  P.W.G. initially confessed to the sexual crimes only 28 to 37 minutes into the interview.

25

Ultimately, the district court concluded that this second factor is "not really determining one way or the other." For its part, the majority states: "The duration of the interrogation is not necessarily determinative of whether it was custodial." Slip op. at 12. I disagree.

Given that P.W.G. admitted to the sexual crimes only 28 to 37 minutes after the beginning of the interview, I believe this factor favors a finding that, due to its short duration, the interview was noncustodial. See *State v. Deal*, 271 Kan. 483, 498-99, 23 P.3d 840 (2001) [(Court found noncustodial interview when defendant questioned at the police station for about three hours.)], *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006); *State v. Jacques*, 270 Kan. 173, 186-87, 14 P.3d 409 (2000) (Court found noncustodial interview when defendant taken to police station and interviewed for about two-and-a-half hours.).

3. *The number of police officers present.*

It is uncontroverted that only Detective Murphy was present at the interview. This third factor caused the district court to observe that it "would point towards non-custodial." My colleagues do not mention this factor as necessarily indicative of either a voluntary interview or custodial interrogation.

I agree with the district court that applying the third factor to this case tends to show that Detective Murphy was conducting a noncustodial interview.

4. *The conduct of the officers and the person subject to the interrogation.*

The district court determined that this fourth factor favored a finding that the interview was custodial. Importantly, however, the district court focused on only one

26

aspect of Detective Murphy's conduct:  *Miranda* warnings were given. As the district judge explained:

> "Well, the *Miranda* was given which points towards this being custodial and in a way this is, I think, kind of a damned if you do, damned if you don't factor. If it's determined to be custodial and you didn't give it, then you have a problem. If you give it, it makes it seem much more custodial."

My colleagues do not address the district court's legal contention that a law enforcement officer's recitation of *Miranda* rights necessarily shows that whatever subsequent questions are posed are necessarily a product of a custodial interrogation. In fact, this is a misstatement of law. As our court indicated in *State v. Whitt*, 46 Kan. App. 2d 570, 574, 264 P.3d 686 (2011):

> "[T]he presence or absence of a *Miranda* warning does not, in itself, aid the district court's determination as to whether this was a custodial interrogation. Giving or not giving *Miranda* warnings does not answer the question of whether an interrogation is custodial. *Miranda* warnings might be given in noncustodial situations, and they might not be given in custodial situations. In both cases, the warnings themselves do not classify the type of encounter."

Although the district judge did not otherwise address Detective Murphy's conduct during the interview relative to this factor, the judge later provided findings emphasizing the fair-minded manner in which Detective Murphy presented *Miranda* warnings to P.W.G. and his father. In my view, these findings should also have been considered in the totality of circumstances to show the fairness of Detective Murphy's interview:

> "[S]o then the next issue, I think, is was there an adequate presentation by the detective of the *Miranda* warning. Well, I think the taped interview is very important here in making this determination. Rather than just reading what took place, the Court was able to see and hear. You know, the detective took considerable time in explaining each

27

one of the rights, paused after reading each one, gave [P.W.G.] and his father time to talk. Now, it seems they didn't talk, but the detective did give plenty of time for a discussion had they wanted it, and he asked them many times if either one of them had questions, if they understood. He asked—he said many times you don't have to talk, you're free to leave. . . . And I believe that the detective's presentation in this case was appropriate and adequate and gave an opportunity for there to be questions or explanation if necessary."

My colleagues acknowledge the State's argument that "Sergeant Murphy did not raise his voice; that [Father] was present with P.W.G. during the interrogation; and that there is no evidence that either [Father] or P.W.G. suffered from any mental, intellectual, or emotional problems that might have affected their perception of whether they could terminate the questioning." Slip op. at 12. But the majority concludes that Detective Murphy's comments and questions during the interview show that he was questioning P.W.G. as a suspect. Slip op. at 12-13. This factor is separately addressed later.

The video recording convinces me that Detective Murphy conducted the interview in a polite, respectful, and informal manner. He was soft-spoken and easy-going. During the interview Detective Murphy did not threaten or intimidate P.W.G. or his father. Rather, the detective persuaded P.W.G. to tell the truth by emphasizing that he understood that P.W.G. "was a kid" and that neither he nor his father or mother were "mad at you" or believed that P.W.G. was "a bad person." Detective Murphy emphasized that E.G. was not hurt as a result of the touching. The detective told P.W.G., "My biggest concern is you." In short, Detective Murphy's questioning was low-key, fair, and affirming towards P.W.G.

Additionally, Detective Murphy allowed P.W.G.'s father to interrupt with questions or comments to P.W.G. or the detective. P.W.G. was attentive during the interview and, although reluctant on occasion to answer certain questions, responded appropriately to the detective's inquiries. P.W.G. was polite and respectful to Detective Murphy and his father. P.W.G. did not raise his voice, become angry, or refuse to answer

28

any questions. The only showing of emotion occurred about 38 minutes into the interview when, having admitted to his wrongdoing, P.W.G. wiped away some tears. During the break, about 40 minutes into the interview, Detective Murphy offered to get P.W.G. a soft drink or water, and then left the room for a few minutes which allowed P.W.G. and his father to converse alone. Finally, there is no evidence, or even an allegation, that the detective lied or deceived either P.W.G. or his father about the facts or evidence he had discovered during his investigation.

In summary, the district court erred as a matter of law in concluding that, because *Miranda* rights were given, the interview was necessarily custodial. On the contrary, substantial competent evidence supports the legal conclusion that Detective Murphy's conduct of the interview and P.W.G.'s behavior during the interview showed that it was noncustodial.

5. *The presence or absence of actual physical restraint or its functional equivalent such as drawn firearms or a stationed guard.*

With regard to the fifth factor, the district judge specifically considered:

> "The presence of physical restraints such as weapons or something like that: No, there weren't. There was—it was in a room with—didn't have bars on the window, the door wasn't locked. Detective was in plain clothes, and according to what I could see in the video and the officer's testimony that he didn't believe there was a weapon showing."

Moreover, there was no evidence that P.W.G. was restrained in any way or that a stationed guard was present. Importantly, the district court did not list this fifth factor as indicative of a custodial interview. My colleagues concede that "P.W.G. was never restrained, and it does not appear from the video that Sergeant Murphy was armed during the interrogation." Slip op. at 14.

29

I agree with the district court that applying this factor to the case facts suggests that the interview was not custodial.

6. *Whether the person was being questioned as a suspect or a witness.*

The district court found that P.W.G. was "being questioned as a suspect." The majority agrees with that finding. The video recording shows Detective Murphy telling P.W.G. and his father at the outset of the interview that, based on the information known to the detective, P.W.G. "can be considered a suspect."

I agree with the district court and my colleagues that at the time of the interview Detective Murphy considered P.W.G. a suspect in the sexual crimes reported by E.G. This sixth factor suggests the interview was custodial in nature. However, this particular factor is not determinative of the custodial interrogation issue. *Whitt*, 46 Kan. App. 2d at 575.

7. *Whether the person being questioned was escorted by the police to the interrogation location or arrived under his or her own power.*

In addressing this factor the district judge found, "Well, here his father brought him. Now, so really, [P.W.G.] was in someone's custody. *It may not have been the custody of the police* but the custody of his father . . . . So, you know, clearly I think he was in the custody of his father." (Emphasis added.) According to the district court, this seventh factor supported a finding of a custodial interrogation.

My colleagues also acknowledge that P.W.G. was not escorted by the police to the interview, but they assert he was not there of his own free will because his father drove him to the police station. At the outset, as framed by our Supreme Court, this factor specifically relates to whether an individual is *escorted by the police to the interrogation location*. The evidence is uncontroverted that P.W.G. was not transported by the police.

30

The majority states a concern, however, that P.W.G. was not there "under his own free will," but that assertion is without any factual basis. Slip op. at 14. On the contrary, the district court found, "Now, in our case [Father] did not coerce, he didn't force and he didn't threaten [P.W.G.] in any way. He was completely reasonable." My review of the record reveals no evidence to suggest that P.W.G.'s father exercised any coercion or deprived P.W.G. of his freedom to choose whether he was agreeable to the interview. Moreover, that assertion is not relevant to this seventh factor.

There is substantial competent evidence to support the factual finding by the district court and the majority that the police did not escort P.W.G. to the police station. The legal conclusion by the district court and my colleagues that this factor weighs in favor of a custodial interrogation, therefore, is both factually and legally mistaken. Obviously, given his age, P.W.G. was not legally able to drive himself to the interview. The fact that P.W.G.'s father drove him to the interview—which is the typical way that 13-year-old children are transported to a destination—indicates that P.W.G. arrived "under his own power" and not by police escort. Applying the seventh factor to this case shows the interview was not custodial.

8. *The result of the interrogation, for instance, whether the person was allowed to leave, was detained further, or was arrested after the interrogation.*

With regard to this eighth factor, the district judge found that P.W.G.

"wasn't arrested, but it was really pretty clear to me during that interview that the detective had a plan that at some point [P.W.G.] was going to either be arrested or detained and charged because the detective said several times that he believed the six-year-old's account of what had happened."

Based on this finding, the district court found this factor indicated the interview was custodial because "the detective had a plan to arrest/charge the juvenile at some point

after the interrogation." For their part, my colleagues do not address the district court's findings but simply concede that P.W.G. "was not arrested or detained afterwards." Slip op. at 14.

My review of the record finds no evidence to support the district court's factual finding that Detective Murphy had a plan to detain or arrest P.W.G. after the interrogation, or at any time for that matter. On the other hand, the evidence is to the contrary. Detective Murphy advised P.W.G. and his father that they could leave the interview room at any time, and at the conclusion of the interview the detective was going to complete a report. Even the district court conceded the "detective said several times that there was not going to be an arrest." In fact, at the conclusion of the interview, P.W.G. was not detained further, was allowed to leave, and was not arrested. Moreover, P.W.G. was *never* arrested, but weeks later received a summons and complaint in the mail requesting his appearance in juvenile court.

Based on the record evidence I agree with my colleagues that there was substantial competent evidence that P.W.G. was not delayed, detained, or arrested following the interview. The district court's legal conclusion, which was not predicated on any evidence presented during the suppression hearing, is in error. Applying the eighth factor to this case shows the interview was not custodial.

CONCLUSION

In summary, I agree with the district court and my colleagues that at the time of the interview P.W.G. was a suspect. I also agree with the district court that because only one officer interviewed P.W.G. and the juvenile was not restrained, these two factors favor a finding of a noncustodial interview. I believe the district court's legal conclusion that because Detective Murphy provided P.W.G. with *Miranda* warnings that the interview was necessarily custodial is an error of law. Similarly, I find the legal

32

conclusion by the district court and my colleagues that because P.W.G. was driven to the interview by his father that it was the equivalent to being escorted by the police was legal error. I also find no substantial competent evidence or legal basis to support the district court's finding that Detective Murphy had a plan to detain or arrest P.W.G. after the interview.

On the other hand, having independently considered the eight factors relevant to this issue, as discussed earlier, I would conclude that seven of the factors favor a finding of a noncustodial interview and one factor suggests a finding of a custodial interrogation. Having considered the totality of the circumstances in this case involving the 13-year-old juvenile, I am convinced that a reasonable person of the same or similar age would have felt free to terminate the interview and leave. See *Warrior*, 294 Kan. at 497.

Although my colleagues concede that with regard to the custodial interrogation question this is "a close case," I disagree. Slip op. at 14. The district court supported its suppression ruling by making several mistaken factual findings and erroneous legal conclusions. Correctly applying the eight factors to the proven facts and circumstances regarding Detective Murphy's questioning of P.W.G. convinces me that the interview was noncustodial. Moreover, because the interview was noncustodial—although *Miranda* warnings were provided to the juvenile and his father, both of them waived the *Miranda* rights, and P.W.G. agreed to talk with the detective—this procedure was not required by the Fifth Amendment or K.S.A. 2017 Supp. 38-2333(a) or (b). Accordingly, I would reverse the district court's order suppressing P.W.G.'s admissions and remand for further proceedings.